STATE OF CONNECTICUT *v.* RAFAEL FERNANDEZ
(SC 15993)

McDonald, C. J., and Borden, Norcott, Sullivan and Vertefeuille, Js.

Argued June 2—officially released October 3, 2000

*Martin Zeldis*, senior assistant public defender, for the appellant (defendant).

*Timothy J. Sugrue*, senior assistant state's attorney, with whom, on the brief, were *James E. Thomas*, state's attorney, *Domenick J. Galluzzo*, executive assistant state's attorney, and *Joan K. Alexander*, supervisory assistant state's attorney, for the appellee (state).

*Richard Blumenthal,* attorney general, and *Terrence M. O'Neill* and *Margaret Quilter Chapple,* assistant attorneys general, filed a brief for the office of the attorney general as amicus curiae.

*Opinion*

SULLIVAN, J. The defendant, Rafael Fernandez, appeals from the judgment of conviction rendered by a three judge panel of the Superior Court. The panel found the defendant guilty of murder in violation of General Statutes § 53a-54a (a),[1] and arson in the first degree in violation of General Statutes § 53a-111 (a) (1).[2] On appeal, the defendant claims that the trial court, *Espinosa, J.,* denied him his constitutional right to counsel in granting defense counsel's motion to withdraw. The defendant also challenges the order of the trial court, *Barry, J.,* vacating its previous order, which had granted the defendant's pro se motion to be transferred to another correctional facility in order to gain access to a law library. The defendant claims that this action resulted in the failure of the state to fulfill its constitutional obligation to provide pro se criminal defendants with access to the courts. We reject both claims. We conclude that: (1) although it was improper for the trial court, *Espinosa, J.,* to have failed to follow strictly the letter of Practice Book (1978–1997) § 632,[3]

---

[1] General Statutes § 53a-54a (a) provides in relevant part: "A person is guilty of murder when, with intent to cause the death of another person, he causes the death of such person . . . ."

[2] General Statutes § 53a-111 (a) provides in relevant part: "A person is guilty of arson in the first degree when, with intent to destroy or damage a building . . . he starts a fire or causes an explosion, and (1) the building is inhabited or occupied or the person has reason to believe the building may be inhabited or occupied . . . ."

[3] Practice Book (1978–1997) § 632 provides: "A motion for withdrawal of appearance shall be served on the prosecuting authority and other attorneys of record, and filed with the clerk in the same manner as entering an appearance. No such motion for withdrawal shall be granted by the judicial authority, except for good cause shown."

the defendant was not denied his constitutional right to counsel when Judge Espinosa granted defense counsel's oral motion to withdraw; and (2) the defendant was not constitutionally entitled to access to a law library in order to have meaningful access to the courts. Accordingly, we affirm the trial court's judgment.

The record reveals the following pertinent facts and procedural history. The defendant was arrested on September 14, 1995, and charged with felony murder in violation of General Statutes § 53a-54c,[4] murder in violation of § 53a-54a (a), first degree burglary in violation of General Statutes § 53a-101 (a),[5] and first degree arson in violation of § 53a-111 (a) (1). In addition, the defendant was charged with tampering with physical evidence in violation of General Statutes § 53a-155 (a) (1).[6] The defendant received the assistance of the office of the public defender from the time that he first appeared before the court on September 15, 1995, until a privately retained counsel, Attorney William T. Gerace, filed an appearance on the defendant's behalf on December 19, 1995.

On May 15, 1996, Gerace made an oral motion to withdraw from the case before *Espinosa, J.*, and in accu-

---

[4] General Statutes § 53a-54c provides in relevant part: "A person is guilty of murder when, acting either alone or with one or more persons, he commits or attempts to commit . . . burglary . . . and, in the course of and in furtherance of such crime or of flight therefrom, he, or another participant, if any, causes the death of a person other than one of the participants . . . ."

[5] General Statutes § 53a-101 (a) provides: "A person is guilty of burglary in the first degree when he enters or remains unlawfully in a building with intent to commit a crime therein and: (1) He is armed with explosives or a deadly weapon or dangerous instrument, or (2) in the course of committing the offense, he intentionally, knowingly or recklessly inflicts or attempts to inflict bodily injury on anyone."

[6] General Statutes § 53a-155 (a) provides in relevant part: "A person is guilty of tampering with or fabricating physical evidence if, believing that an official proceeding is pending, or about to be instituted, he: (1) Alters, destroys, conceals or removes any record, document or thing with purpose to impair its verity or availability in such proceeding . . . ."

rately indicated to the court that he had filed a corresponding written motion. Gerace characterized the motion as "mutually agreed upon" and further stated that the state's attorney did not object to it. He also stated that the motion was "very oblique" because it involved "a sensitive matter that [he did] not want to make a public record in fear of prejudicing [the defendant's] case." Gerace indicated that he had been paid "a substantial retainer" that he wished to return, presumably to the defendant's brother who, Gerace stated, was present in the courtroom, so that the defendant could retain new counsel.

After the state's attorney indicated that he had no objection to Gerace's motion to withdraw, Judge Espinosa stated: "The matter was discussed with the court. The court believes that it is appropriate that Mr. Gerace withdraw from the case." Consequently, Judge Espinosa granted Gerace's motion.[7] Judge Espinosa told the defendant that he would be given time to retain a new attorney, but that the time would not count for speedy trial purposes. The defendant then asked: "What does that mean?" In response, the trial court further explained the speedy trial implications. After Gerace indicated that the defendant could retain new counsel within two weeks, Judge Espinosa again explained her point: "But that two weeks then is not going to be counted. Do you understand that . . . ?" The defendant replied: "That's fine."

Evidently, the defendant did not retain new counsel during the period between May 15 and May 29, 1996. Although the record is unclear at this point, it appears

---

[7] On February 7, 2000, Judge Espinosa issued an articulation in which she stated that she could not remember the exact reasons behind Gerace's withdrawal, "other than [that they were] of an incriminating nature that would have prevented [defense] counsel from effectively representing the defendant in the future and might have placed him in jeopardy of violating . . . [professional] [e]thics."

that the defendant had asked the court if he could proceed pro se because, on May 30, 1996, Judge Espinosa indicated that she had "not decided whether . . . [the defendant was going to] be allowed to represent [himself] . . . ." Judge Espinosa then appointed a public defender who would serve as standby counsel[8] in the event that the defendant was allowed to proceed pro se or who would serve as lead counsel in the event that the defendant was not permitted to proceed pro se. Judge Espinosa then stated that, in the meantime, the public defender could talk to the defendant about the defendant's decision to proceed pro se. Judge Espinosa also tried to impress upon the defendant the seriousness of his situation and the foolhardiness of proceeding pro se: "You are not a lawyer and you are going to be going against an experienced lawyer on the other side that wants to convict you and send you to jail for sixty years."

On June 24, 1996, the matter of the defendant's representation still was not finalized. Michael Isko, a public defender, filed an appearance as standby counsel for the defendant, and Judge Espinosa granted another continuance in light of the defendant's request for more time to retain private counsel.

On July 10, 1996, however, the defendant appeared in court with Isko and stated that he wanted to represent

---

[8] Practice Book §§ 44-4 and 44-5 respectively cover the procedure for appointing and the role of standby counsel. Practice Book § 44-4 provides in relevant part: "When a defendant has been permitted to proceed without the assistance of counsel, the judicial authority may appoint standby counsel, especially in cases expected to be long or complicated or in which there are multiple defendants. . . ."

Practice Book § 44-5 provides: "If requested to do so by the defendant, the standby counsel shall advise the defendant as to legal and procedural matters. If there is no objection by the defendant, such counsel may also call the judicial authority's attention to matters favorable to the defendant. Such counsel shall not interfere with the defendant's presentation of the case and may give advice only upon request."

himself. At that time, the defendant knowingly and intelligently waived his right to counsel before the trial court, *Norko, J.*[9] Isko remained as standby counsel.

Throughout the following months, the defendant filed various pro se motions, including a motion for access to a law library on September 18, 1996, which Judge Barry granted on October 2, 1996, "subject to availability of accommodations within the dep[artment] of [c]orrection."[10]

On October 30, 1996, the office of the attorney general appeared on behalf of the commissioner of correction and moved to vacate Judge Barry's October 2 order granting the defendant access to a law library. Arguments on that motion were heard on October 30. John J. Armstrong, the commissioner of correction, testified that the defendant was then housed at the Walker Reception/Special Management Unit, a high security facility for offenders posing a relatively high risk to public safety and to department of correction personnel. Armstrong further testified that access to the courts was provided to inmates through the office of the public defender and that no correctional facility in Connecticut contained a law library. Armstrong stated that perhaps the largest collection of law books could be found at a facility formerly known as the "state prison at Somers,"

[9] After attempting to explain the complexity of the criminal trial process to the defendant, Judge Norko asked the defendant: "[D]o you feel that you're aware of the dangers and disadvantages . . . of self-representation?" The defendant responded: "Yes." The court continued: "And you still wish to pursue and represent yourself before this court in this particular matter?" The defendant replied: "Yes."

[10] It appears that Judge Barry had little factual information available to assess the merits of the law library motion: "I must confess, I don't know all of the facilities that have law libraries, nor do I know whether any of those that do have available beds . . . ." The state took no position with respect to the defendant's motion, but did raise the issue of whether any law library existed within the department of correction. The trial court indicated that it was the defendant's responsibility to explore the existence of any such facility.

now the Osborn Correctional Institution, which, in 1996, was being used as a "medium security facility." Armstrong expressed concern over transferring an inmate, such as the defendant, who was facing charges of the most serious nature, to a medium security facility: "It presents an undue risk to public safety in the event of a potential escape [and] an undue risk to staff." Armstrong indicated that such a transfer "would just not be sound correctional practice."[11]

Before indicating how he would decide the motion to vacate, Judge Barry again stressed to the defendant the seriousness of his decision to represent himself:

"The Court: You're unable to retain your own attorney, I presume, a private attorney? Is that right?

"[The Defendant]: I do not want to retain. I can afford it, but I do not want to retain him.

"The Court: And you don't want the services of a public defender . . . on a full-time basis?"

The defendant indicated that he did not want a public defender, and that he did not wish to receive advice from standby counsel. Judge Barry then inquired of the defendant: "It may be that your only chance is by retaining an attorney or by having access to the courts through the public defender's office . . . . Do you understand?" The defendant replied: "Yes."

On November 25 and December 5, 1996, the defendant was brought to court to review the state's file. At this point, the record is unclear again. Evidently, the defendant's pro se status had changed because Isko was appointed as the defendant's public defender on January 8, 1997 and filed an appearance "in lieu" of the defendant on January 15, 1997.

---

[11] Armstrong stated that public safety is jeopardized any time an inmate is moved from one facility to another. In addition, Armstrong expressed concern about the budgetary implications arising from such transfers.

On February 4, 1997, the defendant filed another motion to return to pro se status, which was granted by Judge Espinosa on February 5,[12] and Isko again was appointed standby counsel. Jury selection began on February 10, before Judge Norko. After several of his pro se motions had been denied, the defendant, on February 14, before Judge Norko, requested to change his pro se status, and Isko agreed to file an appearance as full counsel. On February 27, Judge Barry granted the commissioner's motion to vacate the previous order granting the defendant access to a law library.

On March 7, 1997, Isko asked for a continuance, claiming that he lacked sufficient time to prepare for trial in light of his relatively recent change in status to full counsel and the somewhat technical nature of the evidence. To accommodate Isko, Judge Norko ordered the office of the public defender to provide Isko with cocounsel and continued the case until March 14, 1997. On March 14, however, Judge Norko declared a mistrial, relying on the fact that the state's attorney could be called as a witness because of various communications with the defendant while the defendant was proceeding pro se.[13]

---

[12] At the hearing on the motion to return to pro se status, Judge Espinosa stated: "The court notes for the record the following history of this case, and the court feels that it is appropriate to outline said history because the court believes that [the defendant], if he gets convicted, is then going to come back and say he didn't know what he was doing. And the court is of the opinion and so finds today that he knows very well what he is doing and that he's going to have to live with the consequences of representing himself."

[13] Judge Norko stated: "[B]ased upon [Isko's] reading of the file and research, the [defendant] is changing [his] defense, which implicates the present state's attorney as a possible witness for the state . . . . With that in mind, the court will declare a mistrial in this particular case. The court will also note that no witnesses were called for the record—that we haven't finished impanelling an entire jury."

Furthermore, Judge Norko indicated that he found "no fault" with the state, the office of the state's attorney or the office of the public defender, and "that the court [was] somewhat at fault for not viewing it as a possible conflict in the future." Judge Norko continued: "However, I don't think that anyone could have predicted that we'd end up in this and, if the defense had remained the same, we wouldn't be in this particular position."

On April 23, 1998, the defendant expressed his desire to proceed pro se again, as well as his desire to be tried by a three judge panel rather than a jury. The defendant then was canvassed by the trial court, *Clifford, J.*, regarding his decision to proceed pro se, the appointment of standby counsel, and his election to be tried by a three judge panel. At this time, the defendant voluntarily waived his right to counsel and his right to a jury trial. Isko again was assigned to be standby counsel. On May 18, 1998, the defendant's case was tried before a three judge panel, *Devlin, Fasano* and *Maloney, Js.* Isko served as standby counsel during that trial.

On May 29, 1998, the panel found the defendant guilty of arson in the first degree and murder. See footnotes 1 and 2 of this opinion and accompanying text. The panel found the defendant not guilty of felony murder, burglary in the first degree and tampering with physical evidence. The defendant was sentenced to a total effective term of fifty-five years imprisonment. The defendant appealed to the Appellate Court, and we transferred the appeal to this court pursuant to General Statutes § 51-199 (c) and Practice Book § 65-1.

I

WITHDRAWAL OF COUNSEL

The defendant first claims that the trial court, *Espinosa, J.*, abused its discretion in granting Gerace's motion to withdraw. The defendant further claims that the trial court, *Espinosa, J.*, failed to comply with Practice Book (1978–1997) § 632 by: (1) allowing Gerace to withdraw notwithstanding the fact that he had not filed a written motion requesting permission to withdraw; and (2) failing to assert with any degree of specificity good cause in support of its decision to grant Gerace's oral motion to withdraw. The defendant argues that, as a result of the court's alleged failure to comply with Practice Book (1978-1997) § 632, he was deprived of

his right to counsel under article first, § 8, of the constitution of Connecticut[14] and under the sixth[15] and fourteenth[16] amendments to the United States constitution. Consequently, the defendant argues that the trial court's judgment of conviction should be reversed. The state argues that any violation of the rules of practice led only to harmless error and that the defendant was not deprived of his right to counsel. We conclude that: (1) the trial court, *Espinosa, J.*, did not abuse its discretion in granting Gerace's motion to withdraw; and (2) although the trial court, *Espinosa, J.*, violated Practice Book (1978–1997) § 632 in failing to require Gerace to file a written motion to withdraw, the defendant suffered no harm from that Practice Book violation, and, consequently, the defendant was not deprived of his constitutional right to counsel.

Decisions regarding the withdrawal of counsel are evaluated under an abuse of discretion standard. See *State* v. *Bethea*, 24 Conn. App. 13, 22–23, 585 A.2d 1235, cert. denied, 218 Conn. 901, 588 A.2d 1076 (1991); cf. *State* v. *Watson*, 198 Conn. 598, 610, 504 A.2d 497 (1986) ("It is the province of the trial court to determine whether there is a factual basis for disqualification of counsel. In such a determination, the trial court is entitled to consider whether the defendant's effort to displace existing counsel has substantive merit and is being pursued in good faith."); *State* v. *Casado*, 42 Conn.

---

[14] Article first, § 8, of the constitution of Connecticut provides in relevant part: "In all criminal prosecutions, the accused shall have a right to be heard by himself and by counsel . . . ."

[15] The sixth amendment to the United States constitution provides in relevant part: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the assistance of counsel for his defense."

[16] The fourteenth amendment of the United States constitution provides in relevant part: "No State shall . . . deprive any person of life, liberty or property, without due process of law . . . ."

The sixth amendment right to counsel is made applicable to the states through the due process clause of the fourteenth amendment. *Gideon* v. *Wainwright*, 372 U.S. 335, 342, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963).

App. 371, 379, 680 A.2d 981, cert. denied, 239 Conn. 920, 682 A.2d 1006 (1996) ("The trial court is bestowed with broad discretion in determining whether the circumstances warrant the appointment of new counsel. . . . [A]bsent a factual record revealing an abuse of that discretion, the court's failure to allow new counsel is not reversible error." [Citations omitted; internal quotation marks omitted.]). The defendant suggests, however, that "a de novo standard of review might be appropriate" in this case.[17] We nevertheless conclude in light of the highly fact-based nature of the trial court's decision on Gerace's oral motion to withdraw, that we will not depart from our precedent and that abuse of discretion is the appropriate standard of review. "The trial judge is the arbiter of the many circumstances which may arise during the trial in which his [or her] function is to assure a fair and just outcome." *State* v. *Bausman*, 162 Conn. 308, 312, 294 A.2d 312 (1972).

The defendant failed to preserve his right to counsel claim in the trial court. He, therefore, seeks review under *State* v. *Golding*, 213 Conn. 233, 567 A.2d 823 (1989), under which "a defendant can prevail on a claim of constitutional error[18] not preserved at trial only if *all* of the following conditions are met: (1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation clearly exists and clearly deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt. In the absence of any one of these

[17] The defendant cites no relevant case law in support of this proposition.

[18] Since *Golding* review is limited to constitutional claims, we will discuss any violation of the rules of practice only insofar as it is relevant to the defendant's constitutional claim; any unpreserved claim alleging a violation of the rules of practice has no independent significance for purposes of appellate review.

conditions, the defendant's claim will fail." (Emphasis in original.) Id., 239–40; see also *Chapman* v. *California*, 386 U.S. 18, 21–22, 87 S. Ct. 824, 17 L. Ed. 2d 705 (1967) (refusing to adopt rule providing that "constitutional errors . . . must always be deemed harmful").

The record in this case does not support a finding that the trial court's decision to grant Gerace's oral motion to withdraw deprived the defendant of his right "to have the assistance of counsel for his defense"; U.S. Const., amend. VI; under the sixth and fourteenth amendments to the United States constitution. The only period of time during the course of the proceedings when the defendant did not have the assistance of counsel, whether standby or otherwise, was during the two week period immediately following Gerace's withdrawal, by the end of which the defendant was expected to have retained new counsel. Furthermore, this two week period occurred approximately two years before the defendant's trial. At each step in the process, the court provided the defendant with counsel or accommodated the defendant's request to proceed pro se and appointed standby counsel to assist the defendant if the need arose.

The defendant argues, however, that he was denied his counsel of choice, namely, Gerace. When Judge Espinosa permitted Gerace to withdraw, however, the defendant voiced no objection. He only asked Judge Espinosa to clarify her warning about the effect on the defendant's right to a speedy trial arising from the two week delay in the proceedings during which the defendant would attempt to retain new counsel. In light of the fact that the defendant filed approximately forty motions while he was representing himself, it is fair to conclude that the defendant had no difficulty asserting himself before the court, and would have done so had he objected to Gerace's withdrawal.

Furthermore, at the hearing to consider the motion to withdraw, Gerace indicated that the defendant's brother was in the courtroom to accept the return of the retainer.[19] This fact leads us to two important conclusions. First, because the defendant's brother was present to accept the unearned portion of the retainer, it seems improbable that the defendant was unaware of Gerace's intention to withdraw. Second, the returned retainer could have been used to secure replacement counsel, had the defendant so desired, during the allotted two week period.[20] This time period served as a reasonable opportunity to retain new counsel, which is all that the sixth amendment demands in this context. See *United States* v. *Hughey*, 147 F.3d 423, 432–33 (5th Cir.), cert. denied, 525 U.S. 1030, 119 S. Ct. 569, 142 L. Ed. 2d 474 (1998). The record does not establish either that Gerace remained the defendant's counsel of choice or that the defendant did not want Gerace to withdraw. Because the defendant did not object to Gerace's withdrawal, Judge Espinosa did not inquire further. "By failing to raise the issue [at the trial court level], where a factual basis could have then been developed, [the] defendant rendered it impossible for us to deal meaningfully with his eleventh hour contention that he was wrongfully deprived of the counsel of his choice." *United States* v. *Hallock*, 941 F.2d 36, 45 (1st Cir. 1991).

Although the defendant cannot point to any time during the proceedings when he indicated that he preferred Gerace over any other attorney, he suggests it now. Even if it is assumed that the defendant's failure to

---

[19] Rule 1.16 (d) of the Connecticut Rules of Professional Conduct requires attorneys, upon withdrawal from representation, to return to a client any unearned portion of a retainer.

[20] The defendant never claimed that Gerace did not return the retainer. In fact, the defendant stated in open court on October 30, 1996: "I do not want to retain. I can afford it, but I do not want to retain him." The defendant's statement indicates that there was no financial impediment to the defendant's hiring new counsel.

object to Gerace's withdrawal could be interpreted as ignorance of what was happening when Gerace withdrew, rather than acquiescence, the right to counsel of one's choice is not without limitation. See, e.g., *Wheat* v. *United States*, 486 U.S. 153, 159, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988) ("[t]he Sixth Amendment right to choose one's own counsel is circumscribed in several important respects"). We never have held that the right to counsel necessarily encompasses the right to a specific attorney. Thus, even if there were some evidence in the record to establish that Gerace was the defendant's counsel of choice, that interest would have to be balanced "against the need to preserve the highest ethical standards of professional responsibility." *United States* v. *Cunningham*, 672 F.2d 1064, 1070 (2d Cir. 1982); see also *United States* v. *Collins*, 920 F.2d 619, 626 (10th Cir. 1990), cert. denied, 500 U.S. 920, 111 S. Ct. 2022, 114 L. Ed. 2d 108 (1991) ("[c]ourts . . . must balance a defendant's constitutional right to retain counsel of his [or her] choice against the need to maintain the highest standards of professional responsibility"). Gerace withdrew from representation in May of 1996. The defendant voiced no objection to Gerace's withdrawal, and the defendant's trial did not commence for another two years. Consequently, we find that Gerace's withdrawal did not materially and adversely affect the defendant's interests. Furthermore, in light of Judge Espinosa's articulation, in which she stated that, while she had no specific recollection of Gerace's withdrawal, she did remember that the reason behind Gerace's withdrawal "was of an incriminating nature that would have prevented [Gerace] from effectively representing the defendant in the future and might have placed him in jeopardy of violating . . . [professional] [e]thics," we conclude that Gerace's withdrawal was "need[ed] to preserve the highest ethical standards of professional responsibility." *United States* v. *Cunningham*, supra, 1070.

Without some indication that the trial court "unreasonably or arbitrarily interfered with [the] defendant's right to counsel of choice, [the court] believe[s] [that] reversal is appropriate only when [the] defendant identifies specific prejudice resulting from [the] denial of preferred counsel, *and* when such prejudice renders the trial fundamentally unfair." (Emphasis in original.) *United States* v. *Mendoza-Salgado*, 964 F.2d 993, 1016 (10th Cir. 1992). Not only did the trial court not unreasonably interfere with the defendant's right to counsel by allowing Gerace to withdraw to avoid potentially violating standards of professional conduct, but the record, as previously described in great detail, reflects that the trial court consistently tried to accommodate the defendant and to educate him about the potential implications of his decisions.

In addition to his claim under the sixth and fourteenth amendments to the United States constitution, the defendant argues that he was deprived of his right to counsel under article first, § 8, of the Connecticut constitution. However, in light of the textual similarities between the federal and Connecticut constitutional provisions[21] and the fact that the defendant offers no convincing reason for a broader reading of article first, § 8, in this context, we will not depart from precedent and will view both provisions as essentially coextensive. See *State* v. *Piorkowski*, 243 Conn. 205, 215, 700 A.2d 1146 (1997) (finding that article first, § 8, of Connecticut constitution and sixth amendment to federal constitution are textually similar with respect to right to counsel); see also *State* v. *Stoddard*, 206 Conn. 157, 165, 537 A.2d 446 (1988) ("[t]he United States Supreme Court has turned to the historical experience of Connecticut in expanding the right to counsel under the federal constitution"). Thus, on the basis of our sixth amendment analysis above, the defendant was not deprived

---

[21] See footnotes 14 and 15 of this opinion.

of the right to counsel under article first, § 8, of the Connecticut constitution.

On the basis of the foregoing, we conclude that the trial court, *Espinosa, J.*, did not abuse its discretion in granting Gerace's motion to withdraw. We further conclude that, with respect to the defendant's claim that he was deprived of his right to counsel, he cannot prevail under *Golding* because he has failed to establish a constitutional violation.

## II

## LAW LIBRARY ACCESS

The defendant next claims that his lack of access to a law library effectively denied him the right to represent himself under the sixth and fourteenth amendments to the United States constitution,[22] and under article first, § 8, of the constitution of Connecticut.[23] The state argues that both the relevant federal and state constitutional provisions were satisfied by virtue of the appointment of standby counsel to assist the defendant in the preparation of his defense. We agree with the state.

In *Bounds* v. *Smith*, 430 U.S. 817, 97 S. Ct. 1491, 52 L. Ed. 2d 72 (1977), the United States Supreme Court concluded that "the fundamental [federal] constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries *or* adequate assistance from persons trained in the law."[24] (Emphasis added.) Id., 828. The court further concluded that the provision of adequate law libraries is just one of the many methods of

[22] See footnotes 15 and 16 of this opinion.

[23] See footnote 14 of this opinion.

[24] This right of access is grounded in due process and equal protection principles. See *Murray* v. *Giarratano*, 492 U.S. 1, 11 n.6, 109 S. Ct. 2765, 106 L. Ed. 2d 1 (1989).

satisfying a defendant's right of meaningful access to the courts. Id., 830. The court encouraged local experimentation with alternatives and also offered a list of possible methods for providing a defendant with meaningful access to the courts, including the use of paraprofessionals, law students, volunteer attorneys, part-time attorney consultants, full-time staff attorneys and inmates trained as paralegal assistants who would work under the supervision of an attorney. Id., 831–32.

Rather than offering a specific remedy, *Bounds* recognizes the criminal defendant's right of access to the courts. See, e.g., *Lewis* v. *Casey*, 518 U.S. 343, 350, 116 S. Ct. 2174, 135 L. Ed. 2d 606 (1996); *Nordgren* v. *Milliken*, 762 F.2d 851, 854 (10th Cir.), cert. denied, 474 U.S. 1032, 106 S. Ct. 593, 88 L. Ed. 2d 573 (1985); *Spates* v. *Manson*, 644 F.2d 80, 84–85 (2d Cir. 1981); see also *Washington* v. *Meachum*, 238 Conn. 692, 736, 680 A.2d 262 (1996) ("reasonable restrictions on inmate telephone calls to attorneys are constitutional, so long as other viable means are available to the inmates to pursue their legal claims"). The right to self-representation in criminal proceedings "does not carry with it a right to state-financed library resources where state-financed legal assistance is available [to satisfy the dictates of *Bounds*]." *Spates* v. *Manson*, supra, 85 (finding "no adequate basis . . . for a conclusion that the programs available to inmates at [a prison in] Somers [Connecticut] do not provide the kind of support and assistance necessary to enable those who wish to act pro se to do so, whether by formal appointment of a standby attorney . . . or otherwise" [citation omitted; internal quotation marks omitted]); see also *Santiago* v. *Commissioner of Correction*, 39 Conn. App. 674, 681, 667 A.2d 304 (1995) ("[p]ractices or regulations are invalid under *Bounds* only if the prisoner is denied access to both legal assistance *and* legal materials" [emphasis added]).

As Armstrong testified at the hearing before Judge Barry on the motion to vacate, no law library exists in any correctional institution in the state. The "state prison at Somers" evidently had more law books than the other state correctional facilities; however, Armstrong highlighted his concerns about the potential safety risks to both the public and department of correction personnel arising from the transfer of an inmate from a high security facility to a medium security facility in order to allow him or her access to those books. See *United States ex rel. George* v. *Lane*, 718 F.2d 226, 232 (7th Cir. 1983) ("requiring prison officials to accompany inmates to legal research facilities outside of the jail would give rise to a multitude of security problems and to manpower deficiencies . . . [and] [e]ven express constitutional guarantees are subject to reasonable limitation or retraction in light of the legitimate security concerns of penal institutions"). In light of the types of concerns articulated by Armstrong, the state proposed an alternative, namely, the use of the public defender's office.

In the present case, the provision of standby counsel afforded the defendant an adequate link to legal information. A public defender served either as standby counsel or as full counsel for the defendant at all times following the two week period after Gerace's withdrawal, the period of time that the court had given to the defendant as an opportunity to retain new counsel. The defendant failed to retain new counsel during that period, and the court provided him with the services of a public defender. That public defender would serve as full counsel when the defendant so desired and as standby counsel when the defendant wished to proceed pro se. Isko was appointed as standby counsel so that he could answer the defendant's questions about the law and offer the defendant advice if he so requested.

Notwithstanding Isko's assistance, the defendant also asserts a right to a law library for his own use. The state, however, adhered to the dictates of *Bounds* by offering the defendant "adequate assistance from [a person] trained in the law [in this case, Isko]." *Bounds* v. *Smith,* supra, 430 U.S. 828; see *Carper* v. *DeLand,* 54 F.3d 613, 616 (10th Cir. 1995) ("A state may elect to provide legal assistance to inmates in lieu of maintaining an adequate prison law library . . . . Legal assistance, however, does not necessarily entail assistance from a lawyer." [Citation omitted.]); *United States ex rel. George* v. *Lane,* supra, 718 F.2d 231 ("the offer of court-appointed counsel to represent a defendant satisfies the constitutional obligation of a state to provide a defendant with legal assistance under the Sixth and Fourteenth Amendments"); see also *Strickler* v. *Waters,* 989 F.2d 1375, 1385 (4th Cir.), cert. denied, 510 U.S. 949, 114 S. Ct. 393, 126 L. Ed. 2d 341 (1993) ("*Bounds* did not hold that there is a right of access to a law library; it held that there is a right of access to the *courts*" [emphasis in original]).

It is not within the province of the judiciary to micromanage prisons. See, e.g., *Washington* v. *Meachum,* supra, 238 Conn. 734; see also *Lewis* v. *Casey,* supra, 518 U.S. 349. In this regard, the courts evaluate the claims asserted by inmates; the other political branches implement the solutions. "It is for the courts to remedy past or imminent official interference with individual inmates' presentation of claims to the courts; it is for the political branches of the State and Federal Governments to manage prisons in such fashion that official interference with the presentation of claims will not occur." *Lewis* v. *Casey,* supra, 349. In the present case, however, the defendant has failed to demonstrate how "the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." Id., 351. On the contrary, the defendant does

not claim that he would have proceeded differently or pursued an alternative defense strategy had he been afforded access to a law library. Thus, the defendant is not contending that he was harmed by the denial of access to a law library, but, rather, that the denial of access to a law library was, itself, the harm suffered. In light of the alternative available to the defendant, namely, Isko's assistance, we conclude that there was no constitutional violation by virtue of the denial of access to a law library. It is not our role—nor is it the role of the defendant—to suggest which mode of access is best. Rather, we must determine whether the particular mode of access available to the defendant in this case deprived the defendant of his constitutional rights. We conclude that it did not.

We recently stated in *State* v. *Shashaty*, 251 Conn. 768, 742 A.2d 786 (1999), cert. denied, 529 U.S. 1094, 120 S. Ct. 1734, 146 L. Ed. 2d 653 (2000), that "we generally have interpreted the state and federal constitutions as providing essentially equivalent protections with respect to a defendant's right to self-representation." Id., 780. Our conclusion in the present case that there was no denial of access to the courts and no denial of the right to self-representation under the United States constitution eliminates the need for us to evaluate the defendant's claim on state constitutional grounds. As in previous cases, we conclude that standby counsel serves as a legal resource to pro se defendants, thereby enabling them to have meaningful access to the courts while still exercising their right to represent themselves. See id. ("the trial court's use of standby counsel to ensure that the defendant had access to legal materials did not violate the defendant's right to self-representation under the state constitution"); see also *State* v. *Day*, 233 Conn. 813, 854–55, 661 A.2d 539 (1995) ("standby counsel can serve a more active role and exercise a larger degree of independent initiative with-

out infringing the right to self-representation . . . [as long as] the pro se defendant is entitled to preserve actual control over the case he [or she] chooses to present to the jury . . . [and as long as] participation by standby counsel without the defendant's consent [is] not . . . allowed to destroy the jury's perception that the defendant is representing himself" [internal quotation marks omitted]).

In sum, we clarify our holding on this issue in the form of a bright line rule: A criminal defendant who knowingly and intelligently waives the right to counsel and who has been appointed standby counsel is not constitutionally entitled to access to a law library. Rather, the appointment of standby counsel satisfies the state's obligation to provide the defendant with access to the courts. We also clarify that the role of standby counsel is essentially to be present with the defendant in court and to supply the limited assistance provided for in Practice Book § 44-5,[25] the provision governing the function of standby counsel. We further clarify that standby counsel does not, however, have any obligation to perform legal research for the defendant.

The judgment is affirmed.

In this opinion the other justices concurred.

---

[25] Practice Book § 44-5 provides: "If requested to do so by the defendant, the standby counsel shall advise the defendant as to legal and procedural matters. If there is no objection by the defendant, such counsel may also call the judicial authority's attention to matters favorable to the defendant. Such counsel shall not interfere with the defendant's presentation of the case and may give advice only upon request."