******************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.
******************************************

# STATE OF CONNECTICUT *v.* GHEORGHE DIJMARESCU
## (AC 39745)

Alvord, Prescott and Bear, Js.

*Syllabus*

Convicted of the crime of breach of the peace in the second degree in connection with an incident in which he struck his wife, L, during an argument, the defendant appealed to this court. He claimed, inter alia, that the trial court improperly admitted certain evidence of prior uncharged misconduct, which pertained to an incident in which he allegedly punched L. The state conceded at oral argument that the trial court abused its discretion in admitting the challenged evidence but claimed that any such error was harmless. *Held*:

1. The trial court did not abuse its discretion in granting the motion filed by the defendant's counsel to withdraw from representation, which was filed the same day as it was argued: the record made clear that the defendant had actual notice of counsel's intention to withdraw, as the defendant indicated in response to a question by the court that he was aware of his counsel's intention to withdraw prior to the court's consideration of the motion, counsel complied with the purpose of the notice provision in the applicable rule of practice (§ 3-10 [a]), the trial court's conclusion that communication had broken down could properly constitute good cause for counsel to withdraw, and to the extent that the court did not sufficiently explain, in detail, why it determined that counsel had demonstrated good cause to withdraw, the failure to do so did not result in an abuse of discretion because the court was entitled to rely on the representations of counsel, who indicated that the defendant had made representation by him unreasonably difficult and that he tried to prepare the defendant for trial but met some resistance and had difficulty getting the defendant to cooperate with him, which supported a conclusion that counsel had good cause to withdraw; moreover, the defendant did not demonstrate any material adverse effect on him related to the timing of counsel's withdrawal, as the motion to withdraw was filed long before trial commenced and did not implicate the defendant's sixth amendment right to counsel.

2. The defendant did not meet his burden to establish that the trial court's admission of the uncharged misconduct evidence substantially affected the verdict, and, therefore, the admission of that evidence was harmless; there was overwhelming evidence to support the defendant's conviction of breach of the peace in the second degree, as L's testimony that he slammed her head into a table was corroborated by medical records, and the testimony of a police officer and a worker at a women's shelter, the defendant's intent to cause L alarm was supported by her testimony that she feared him and did not want to return to the marital home, the court's jury instructions regarding the proper purpose for which the uncharged misconduct could be considered mitigated the risk that the jury would assume that the defendant had a propensity to engage in abusive behavior toward L, defense counsel extensively cross-examined L, the alleged uncharged misconduct was not so much more severe than the charged conduct such that there was a substantial risk that the jury's passions would be unduly aroused, and the state mentioned the prior misconduct only once during its closing argument.

3. The defendant's claim that the trial court's failure to canvass him regarding his decision to testify violated his right against self-incrimination was unavailing; the court was under no obligation to inquire of the defendant whether his decision to testify was intelligent and voluntary, as he was represented by counsel throughout trial, and the circumstances here did not call for the exercise of this court's supervisory authority over the administration of justice.

Argued January 8—officially released May 22, 2018

*Procedural History*

Substitute information charging the defendant with the crimes of assault in the third degree and breach of the peace in the second degree, brought to the Superior Court in the judicial district of Hartford, geographical area number fourteen, where the court, *Johnson, J.*, granted the motion to withdraw from representation filed by the defendant's counsel; thereafter, the matter was tried to the jury before *Mullarkey, J.*; subsequently, the court, *Mullarkey, J.*, denied the defendant's motion to preclude certain evidence; verdict and judgment of guilty of breach of the peace in the second degree, from which the defendant appealed to this court. *Affirmed.*

*John L. Cordani*, *Jr.*, assigned counsel, for the appellant (defendant).

*Rita M. Shair*, senior assistant state's attorney, with whom were *Gail P. Hardy*, state's attorney, and, on the brief, *Michael J. Weber*, *Jr.*, senior assistant state's attorney, for the appellee (state).

*Opinion*

PRESCOTT, J. The defendant, Gheorghe Dijmarescu, appeals from the judgment of conviction, rendered after a jury trial, of one count of breach of the peace in the second degree in violation of General Statutes § 53a-181 (a) (2). On appeal, the defendant claims that the trial court (1) violated his sixth amendment right to counsel by improperly granting his attorney's motion to withdraw, (2) improperly admitted evidence of his uncharged misconduct, and (3) violated his right against self-incrimination by not canvassing him before he elected to testify. We disagree and, accordingly, affirm the judgment of the trial court.

The jury reasonably could have found the following facts. The defendant and the victim, L,[1] both are accomplished mountaineers. In 2000, the two met at a party hosted by the governments of Pakistan and Nepal after L successfully summited Mount Everest. In May, 2002, the couple was married in Connecticut. They have two children.

During their marriage, the defendant and L climbed Mount Everest together several times. The defendant also occasionally went on climbing expeditions by himself, leaving L and the children behind at their home in Connecticut. When he was not away, the defendant managed his own construction company, while L took care of the couple's two children and the defendant's ailing father.

On July 1, 2012, L went grocery shopping and discovered that the family's food stamp card was not working. She called the defendant at work and he became angry. At about 7 or 8 p.m., the defendant arrived home. L was in the kitchen cutting an onion. The two then got into an argument regarding the food stamp card. At one point during the argument L said something in her native language, and the defendant struck her.[2] The defendant then left the house and drove away in his truck.

After the defendant left, L called her friend and told her that the defendant hit her. L's friend advised her to call the police. L then spoke with her brother, who called the police on her behalf.

Shortly thereafter, the police arrived and interviewed L. An ambulance and medical personnel also responded to the scene, but L refused to go with them because they would not allow her daughters to ride in the ambulance with her. L then indicated to one of the police officers that she did not feel safe at her home, so an officer took her and her two daughters to a hospital emergency department and arranged for them to stay at a shelter. L's examination at the emergency department revealed that she had suffered no visible injuries to her head, but that she did have several scratches on her left forearm. L did not return to the marital home, and she and the defendant ultimately obtained a divorce.

Shortly after the incident, the defendant was arrested and charged with assault in the third degree and breach of the peace in the second degree. He was subsequently tried before a jury. At trial, the defendant elected to testify in his own defense.[3]

The jury found the defendant not guilty of assault in the third degree but found him guilty of breach of the peace in the second degree. He was sentenced to six months of incarceration, execution suspended, followed by one year of probation. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the trial court violated his sixth amendment right to counsel by granting the motion to withdraw filed by his private attorney, Raymond M. Hassett. Specifically, the defendant argues that the court improperly granted the motion to withdraw because the notice and good cause requirements set forth in Practice Book § 3-10 (a) were not met. Because we determine that, under the circumstances presented here, the defendant had no sixth amendment right to be represented by Hassett, our review of the defendant's claim is limited to whether the court abused its discretion in granting the motion to withdraw. We further conclude that the court did not abuse its discretion in granting the motion to withdraw.

The following additional facts are relevant to the resolution of the defendant's claim. On July 17, 2012, the defendant was arraigned. On that day, Hassett filed an appearance on behalf of the defendant.

On July 10, 2013, the defendant and Hassett appeared in court. At that time, Hassett requested that the court, *Johnson, J.*, allow him to withdraw as counsel.[4] Hassett presented the court with a written motion, although he had not yet filed it. Hassett later filed the written motion to withdraw with the clerk's office.

The court then held a hearing on Hassett's motion to withdraw. Hassett told the court that he previously had "numerous discussions with [the defendant]" and that he "believed that there ha[d] been somewhat of a breakdown of communication . . . ." Hassett further stated that the defendant had been adamant "from day one that he want[ed] to proceed to trial," and that Hassett had "tried to prepare [the defendant] for trial and prepare the case for trial" and had "met some resistance."

Hassett also represented that "the major reason why" he was asking to withdraw from the case was that he had difficulty getting the defendant to cooperate with him. Hassett told the court that he had advised the defendant that he needed to make a decision regarding whether he wanted to proceed with the family violence education program. See General Statutes § 46b-38c (h)

(1). When the defendant elected not to apply for the program, Hassett explained to him the possible ramifications of going to trial. Finally, Hassett stated that, despite the fact that he liked the defendant, he believed that his ability to represent the defendant had been compromised. The court then heard from the state, which asked it to move the case to the trial list if the defendant chose not to apply for the family violence education program.

Next, the court asked the defendant whether he agreed that he could no longer work with Hassett, to which the defendant responded that he did not want Hassett to withdraw because he thought Hassett was an excellent attorney who could provide him with the "best representation . . . ." The defendant further stated that, although he and Hassett had encountered some obstacles, he believed that they could be overcome.

The court then canvassed the defendant regarding his opportunity to apply for the family violence education program and informed the defendant that if he successfully participated in the program he would have his charges dismissed. The defendant responded that Hassett had informed him of the same many times, both verbally and in writing. The court then asked the defendant whether he understood that, if he proceeded to trial and was convicted, he faced the possibility of being sentenced to eighteen months incarceration and $3000 in fines. The defendant replied that he understood but nevertheless wanted to proceed to trial.

After canvassing the defendant, the court concluded that "[b]ased on everything that I have heard, I am [going to] grant the motion to have counsel withdraw from the case. I agree with you. You have an excellent attorney. Your attorney probably has given you the best advice and has spent a considerable amount of time with you. At this time, he feels, based on his experience, that communication has broken down." The court then continued the case for approximately six weeks to allow the defendant time to hire a new attorney.

On September 12, 2013, the defendant again appeared before the court. At that time, the defendant told the court that he had not yet retained an attorney because he no longer could afford one and wanted to represent himself. The court canvassed the defendant regarding the risks of representing himself and decided to allow the defendant to proceed as a self-represented litigant, with an attorney from the public defender's office acting as standby counsel. On April 9, 2014, however, the defendant was appointed a special public defender, Attorney Robert A. Cushman. Cushman subsequently entered a full appearance on behalf of the defendant and represented him throughout his trial, which began in December, 2015.

## A

We first address whether the defendant had a sixth amendment right to counsel of choice that was implicated by the court's decision to grant Hassett's motion to withdraw over the defendant's objection. Whether the defendant's constitutional right to counsel of choice was implicated presents a question of law, over which our review is plenary. See *State* v. *Peeler*, 320 Conn. 567, 578, 133 A.3d 864, cert. denied,      U.S.     , 137 S. Ct. 110, 196 L. Ed. 2d 89 (2016).

The United States Supreme Court has stated that although "the right to select and be represented by one's preferred attorney is comprehended by the [s]ixth [a]mendment, the essential aim of the [a]mendment is to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat* v. *United States*, 486 U.S. 153, 159, 108 S. Ct. 1692, 100 L. Ed. 2d 140 (1988).

Indeed, "[t]he [s]ixth [a]mendment right to choose one's own counsel is circumscribed in several important respects . . . [including that] a defendant may not insist on representation by an attorney he cannot afford or *who for other reasons declines to represent the defendant*." (Emphasis added.) Id. "[T]he [s]ixth [a]mendment simply does not provide an inexorable right to representation by a criminal defendant's preferred lawyer. . . . [T]here is no constitutional right to representation by a particular attorney." (Citations omitted; internal quotation marks omitted.) *United States* v. *Hughey*, 147 F.3d 423, 428 (5th Cir.), cert. denied, 525 U.S. 1030, 119 S. Ct. 569, 142 L. Ed. 2d 474 (1998); see also *State* v. *Peeler*, supra, 320 Conn. 579; *State* v. *Fernandez*, 254 Conn. 637, 651, 758 A.2d 842 (2000) ("[T]he right to counsel of one's choice is not without limitation. . . . We never have held that the right to counsel necessarily encompasses the right to a specific attorney." [Citation omitted.]), cert. denied, 532 U.S. 913, 121 S. Ct. 1247, 149 L. Ed. 2d 153 (2001).[5] Accordingly, we reject the defendant's claim that his sixth amendment right to counsel of choice was implicated by the motion to withdraw filed by Hassett.

## B

Because we conclude that the motion to withdraw did not implicate the defendant's sixth amendment right to counsel, we need only determine whether the court abused its discretion in granting the motion. The defendant argues that the court improperly granted the motion because it failed to ensure that the notice and good cause requirements set forth in Practice Book § 3-10 (a) had been met. We disagree.

We review the trial court's granting of a motion to withdraw pursuant to an abuse of discretion standard. *State* v. *Gamer*, 152 Conn. App. 1, 33, 95 A.3d 1223

(2014). Practice Book § 3-10 (a) provides in relevant part that "[n]o motion for withdrawal of appearance shall be granted unless good cause is shown and until the judicial authority is satisfied that reasonable notice has been given to other attorneys of record and that the party represented by the attorney was served with the motion and the notice required by this section or that the attorney has made reasonable efforts to serve such party. . . ."

The defendant first argues that the court improperly granted Hassett's motion to withdraw because the motion was filed the same day that it was argued and, therefore, did not comply with the notice requirements set forth in Practice Book § 3-10 (a). The defendant further argues that, because of this, he was not allowed an opportunity to repair his relationship with Hassett.

Although it is true that Hassett did not file his written motion to withdraw before the court heard argument, the record makes clear that the defendant had actual notice of Hassett's intention to withdraw. In addressing the defendant, the court asked, "Mr. Dijmarescu, your attorney has indicated that it is his wish . . . that he no longer work with you on the criminal charge that is pending in this court today," to which the defendant responded, "[t]*hat's what I was told*, Your Honor. Yes." (Emphasis added.) It is therefore apparent that the defendant was aware of Hassett's intention to withdraw prior to the court's consideration of the motion. Thus, although Hassett's motion was technically filed the same day it was addressed by the court, he nevertheless complied with the purpose of the notice provision set forth in Practice Book § 3-10 (a), which is "to inform the court, other attorneys of record, and the party represented by the attorney that he or she is seeking permission to withdraw." *State* v. *Gamer*, supra, 152 Conn. App. 34; see *State* v. *Fernandez*, supra, 254 Conn. 650 (court did not abuse discretion in granting defense counsel's oral motion to withdraw where defendant's brother was present in court that day to accept from counsel unearned portion of retainer, making it unlikely that defendant was unaware of counsel's intention); see also *State* v. *Gamer*, supra, 34 (court did not abuse discretion in granting defense counsel's motion to withdraw even though motion did not specify date and time of hearing).

Next, the defendant argues that the court abused its discretion in granting Hassett's motion to withdraw because it failed to make a finding of good cause as required by Practice Book § 3-10 (a). The defendant asserts that the court's conclusion that "communication ha[d] broken down" between Hassett and the defendant was insufficient.

Rule 1.16 (b) of the Rules of Professional Conduct dictates when a lawyer may properly terminate representation, and provides, in relevant part, that "[e]xcept

as stated in subsection (c), a lawyer may withdraw from representing a client if: (1) withdrawal can be accomplished without material adverse effect on the interests of the client . . . (6) the representation will result in an unreasonable financial burden on the lawyer or has been *rendered unreasonably difficult by the client*; or (7) other good cause for withdrawal exists." (Emphasis added.)

Thus, in accordance with rule 1.16 (b) (1), withdrawal is appropriate for any reason provided that it will not have a materially adverse effect on the client.[6] Additionally, withdrawal is also appropriate if the representation has been rendered unreasonably difficult by the client. Thus, a breakdown in communication between attorney and client may properly constitute good cause to withdraw as counsel. See *State* v. *Gamer*, supra, 152 Conn. App. 34–35.

Furthermore, to the extent that the court did not sufficiently explain, in detail, why it determined that Hassett had demonstrated good cause to withdraw, we conclude that any failure to do so did not result in an abuse of discretion because the court was entitled to rely on the representations of Hassett, who indicated that the defendant had made representation by him unreasonably difficult. "A trial court is entitled to rely on the representations of counsel, who is an officer of the court. . . . [I]t has long been the practice that a trial court may rely upon certain representations made to it by attorneys, who are officers of the court and bound to make truthful statements of fact or law to the court." (Citation omitted; internal quotation marks omitted.) Id., 35. Thus, we can assume that, in making its ruling, the court properly considered representations made to it by Hassett that he (1) tried to prepare the defendant for trial and met some resistance, and (2) had difficulty getting the defendant to cooperate with him—both of which support the court's conclusion that Hassett had good cause to withdraw as counsel.[7] Moreover, the motion was filed long before trial actually commenced, and the defendant has not demonstrated any material adverse effect on him related to the timing of Hassett's withdrawal. We conclude, therefore, that the court did not abuse its discretion in granting Hassett's motion to withdraw.

## II

The defendant next claims that the court improperly admitted evidence of his uncharged misconduct at trial. Specifically, the defendant argues that the evidence should have been excluded because (1) the state's failure to timely disclose it was prejudicial to the defendant, and (2) the evidence was not relevant or material to the defendant's intent, motive, or malice to engage in the charged conduct. For reasons we address fully below, we need not determine whether the court's admission of the uncharged misconduct evidence con-

stituted an abuse of discretion because we conclude that any error was harmless.

The following additional facts and procedural history are relevant to the resolution of this claim. On December 26, 2013, the defense filed a motion for notice of uncharged misconduct. On August 14, 2014, the defense made a request for disclosure regarding any uncharged misconduct that the state intended to offer at trial. The state did not provide notice of its intent to offer uncharged misconduct evidence at that time.

On December 7, 2015, jury selection began. On that same day, the state notified the defendant, for the first time, of its intent to offer evidence of the defendant's uncharged misconduct. In its notice of intent, the state revealed that the uncharged misconduct evidence would be offered through the testimony of L,[8] although it did not specify the particular acts of uncharged misconduct. The state also argued in its notice of intent that the uncharged misconduct of the defendant was relevant to show the defendant's intent, motive, and malice to engage in the charged conduct, as well as to corroborate crucial prosecution testimony.

On December 10, 2015, the defendant filed a motion in limine, in which he sought to preclude the admission of any uncharged misconduct evidence. The defendant argued that such evidence should be precluded at trial because (1) the state's untimely notice of its intent to offer uncharged misconduct evidence violated the defendant's right to due process, and (2) the prejudicial effect of the evidence outweighed its probative value.

On December 10 and 11, 2015, the court addressed the defendant's motion in limine. On the latter date, the state specified that it intended to offer evidence, through the testimony of L, of an incident that occurred on Mount Everest in 2004 during which the defendant allegedly struck L and knocked her unconscious. The court then issued a "preliminary" ruling denying the defendant's motion but stated that it would reserve the right to make a final judgment until it heard L's prospective testimony.

On December 14, 2015, the state made an offer of proof outside the presence of the jury, through the testimony of L, regarding the defendant's uncharged misconduct. L testified that she and the defendant successfully summited Mount Everest in 2004 with a number of other individuals, and that the group stopped at base camp for a period of time during their descent from the mountain. L further testified that, while at base camp, she went into the dining tent to speak with the defendant about his poor treatment of their fellow climbers. L alleged that the defendant then became angry and punched her in her head, causing her to lose consciousness. When she woke up, she temporarily was unable to see through one of her eyes because blood

had accumulated in it.

After the state made its offer of proof, the court denied the defendant's motion in limine. With respect to the state's untimely disclosure of its intent to offer such evidence, the court determined that the defendant had not been prejudiced because "while the state was a little tardy in announcing the testimony about this incident, the defense has had it for approximately one year." The court appeared to be referencing the fact that, during the parties' divorce proceedings, L testified about the same alleged incident. The court further concluded that the evidence was more probative than prejudicial, provided that a proper limiting instruction was given to the jury.

At trial, L testified consistent with the state's proffer. Her testimony was followed by a limiting instruction concerning the proper purpose for which the evidence could be considered by the jury.[9] The court gave a similar instruction during its final charge.

We now turn to the relevant law. Section 4-5 of the Connecticut Code of Evidence governs the admission of uncharged misconduct evidence, and provides that "[e]vidence of other crimes, wrongs or acts of a person is inadmissible to prove the bad character, propensity, or criminal tendencies of that person except as provided in subsection (b)." Conn. Code Evid. § 4-5 (a). Under § 4-5 (c), however, "[e]vidence of other crimes, wrongs or acts of a person is admissible for purposes *other* than those specified in subsection (a), such as to prove intent, identity, malice, motive, common plan or scheme, absence of mistake or accident, knowledge, a system of criminal activity, or an element of the crime, or to corroborate crucial prosecution testimony." (Emphasis added.) Conn. Code Evid. § 4-5 (c).

"To determine whether evidence of . . . [uncharged] misconduct falls within an exception to the general rule prohibiting its admission, we have adopted a two-pronged analysis. . . . First, the evidence must be relevant and material to at least one of the circumstances encompassed by the exceptions. Second, the probative value of such evidence must outweigh the prejudicial effect of the . . . [uncharged misconduct] evidence. . . . Since the admission of uncharged misconduct evidence is a decision within the discretion of the trial court, we will draw every reasonable presumption in favor of the trial court's ruling. . . . We will reverse a trial court's decision only when it has abused its discretion or an injustice has occurred." (Internal quotation marks omitted.) *State* v. *Urbanowski*, 163 Conn. App. 377, 402–403, 136 A.3d 236 (2016), aff'd, 327 Conn. 169, 172 A.3d 201 (2017).

The defendant argues that the court abused its discretion in admitting the uncharged misconduct testimony because (1) the state's failure to timely disclose it was

prejudicial to him, and (2) the evidence was not relevant or material to the defendant's intent, motive, or malice in engaging in the charged conduct.

Ordinarily, we would begin with an analysis of whether the court abused its discretion in admitting the uncharged misconduct evidence. See id. At oral argument before this court, however, the state conceded, despite arguing otherwise in its brief, that the trial court abused its discretion in admitting the uncharged misconduct evidence. Instead, the state argued that such error was harmless.[10] Thus, for the purposes of our analysis, we will assume, without deciding, that the court abused its discretion in admitting the uncharged misconduct evidence and, therefore, need only determine whether the admission of the evidence was harmless.

"The defendant bears the burden of showing that a nonconstitutional evidentiary error, such as the improper admission of prior uncharged misconduct . . . was harmful." *State* v. *Martin V.*, 102 Conn. App. 381, 388, 926 A.2d 49, cert. denied, 284 Conn. 911, 931 A.2d 933 (2007). "[W]hether [an improper evidentiary ruling that is not constitutional in nature] is harmless in a particular case depends on a number of factors, such as the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case. . . . Most importantly, we must examine the impact of the [improperly admitted] evidence on the trier of fact and the result of the trial. . . . [T]he proper standard for determining whether an erroneous evidentiary ruling is harmless should be whether the jury's verdict was substantially swayed by the error. . . . Accordingly, a nonconstitutional error is harmless when an appellate court has a fair assurance that the error did not substantially affect the verdict." (Internal quotation marks omitted.) *State* v. *Urbanowski*, supra, 163 Conn. App. 407.

We begin with the "most relevant factors to be considered," which are "the strength of the state's case and the impact of the improperly admitted evidence on the trier of fact." (Internal quotation marks omitted.) *State* v. *Michael A.*, 99 Conn. App. 251, 270–71, 913 A.2d 1081 (2007). With respect to the strength of the state's case, we conclude that there was overwhelming evidence to support the defendant's conviction of breach of the peace in the second degree.

Section 53a-181 (a) provides in relevant part that "[a] person is guilty of breach of the peace in the second degree when, with intent to cause inconvenience, annoyance or alarm, or recklessly creating a risk thereof, such person . . . (2) assaults or strikes

another . . . ." With respect to the evidence that the defendant struck L, L testified that the defendant grabbed her by her hair and slammed the right hand side of her head into the kitchen table. Her testimony was strongly corroborated by both Officer Steven Chesworth of the Hartford Police Department, who testified that he found L holding her head when he responded to the scene, as well as Sheila Coleman, who worked at the women's shelter that L and her daughters were subsequently transported to, and similarly testified that L repeatedly touched the side of her head during her intake interview. Moreover, L was consistent in her claim that the defendant had struck her, as evidenced by the medical record of L's trip to the emergency room that night. The report, which was admitted as a full exhibit at trial and read to the jury, revealed that she told her treating physician that she was assaulted by her husband, who grabbed her by her hair and pushed her against a wood table, and that L complained of pain on the right side of her head. Finally, L testified that the defendant "tried to grab [her] and tried to twist [her] like a crocodile," and the medical record noted that she had sustained "scratch marks on her left forearm . . . ."

With respect to the evidence that the defendant intended to cause alarm to L, L testified that, as a result of the defendant's abuse, she feared him and did not want to return to the marital home. This testimony was also strongly corroborated by Chesworth, who testified that, when he arrived on the scene, L was "visibly upset," her hands were shaking, and he could "tell something happened . . . ." He further testified that L made it very clear that she did not feel safe staying at the marital home, and in fact refused to return. Coleman similarly testified that L was visibly shaken when she arrived at the shelter.

Perhaps most notably, L's testimony that she feared the defendant was corroborated by her own actions. Critically, despite the fact that she grew up in a different country, barely spoke English, and did not have a job, L never returned to the marital home after July 1, 2012. Instead, she and her two daughters lived in a women's shelter for eight months before moving to an apartment in West Hartford. Thus, because the defendant struck L, and because she suffered fear and emotional turmoil as a result of his actions, the jury was free to infer that the defendant intended the natural result of those actions. See *State* v. *Ortiz*, 312 Conn. 551, 565, 93 A.3d 1128 (2014) ("it is a permissible . . . inference that a defendant intended the natural consequences of his voluntary conduct" [emphasis omitted; internal quotation marks omitted]); see also *State* v. *VanDeusen*, 160 Conn. App. 815, 826, 126 A.3d 604 (jury may properly infer that defendant intended natural consequences of his actions), cert. denied, 320 Conn. 903, 127 A.3d 187 (2015).

In sum, considering the testimony of L, Chesworth, and Coleman, there was overwhelming evidence that the defendant intended to cause alarm to L by striking her. See *State* v. *Franko*, 142 Conn. App. 451, 470, 64 A.3d 807 (state's case strong in part because "[n]umerous law enforcement officers corroborated the fact that the victim was . . . visibly upset"; physical evidence of victim's scratches consistent with victim being struck), cert. denied, 310 Conn. 901, 75 A.3d 30 (2013).

We next consider the impact of the uncharged misconduct evidence on the trier of fact. The principal issue in this case was whether the defendant did, in fact, strike L. The danger in a court improperly admitting evidence of the defendant's uncharged misconduct is that the jury will hear that evidence and assume that, because the defendant committed similar acts in the past, he or she is guilty of the charged offense. See *State* v. *Bell*, 152 Conn. App. 570, 582, 99 A.3d 1188 (2014). Thus, in the present case, the evidence admitted relating to the 2004 Mount Everest incident carried with it the risk that the jury would simply assume that the defendant struck L on July 1, 2012, because he had done so in the past.

The risk that the jury would simply assume that the defendant has a general propensity to engage in the abusive behaviors toward L, however, was mitigated in part by the fact that the court issued a limiting instruction immediately following L's testimony and then again during its final charge to the jury regarding the proper purpose for which the uncharged misconduct could be considered. Absent evidence suggesting otherwise, we assume that the jury followed the court's instructions and did not consider the uncharged misconduct evidence for that improper purpose. Id., 583 ("[t]he jury is presumed to follow the instructions in full"). Thus, "any harm caused by the uncharged misconduct testimony was minimized by the court's limiting instruction." Id.

Another factor to consider in determining whether the uncharged misconduct evidence prejudicially impacted the jury is the extent to which cross-examination of L, the state's key witness, was permitted. See *State* v. *Urbanowski*, supra, 163 Conn. App. 407. In this case, defense counsel engaged in an extensive cross-examination of L intended to undermine her credibility and to present her as an instigator of any violence between her and the defendant. For example, with respect to the 2004 Mount Everest incident, defense counsel asked L whether it was true that she had (1) attacked a fellow climber on the trip because she was jealous that the climber had spent time with the defendant, (2) barged into the dining tent screaming at the defendant and asking for a divorce, and (3) told an attorney that an article written about the 2004 Mount Everest incident between her and her husband was fab-

ricated.

Defense counsel also asked L a series of questions relating to the July 1, 2012 incident, which gave rise to the charges against the defendant, in an effort to challenge her allegations that the defendant had attacked her and to suggest that it was L, in fact, who had attacked him. Specifically, defense counsel asked L whether it was true that, on July 1, 2012, she (1) yelled at the defendant, (2) threw an onion at the defendant, (3) lunged at the defendant, (4) did not call 911, (5) refused medical treatment, and (6) did not sustain any head injuries. In addition, defense counsel cross-examined L regarding a 2009 incident during which she allegedly called 911 because the defendant was about to leave on a climbing expedition and she was worried that he was going to have an extramarital affair. It is clear, therefore, that the defendant had the opportunity to cross-examine L extensively with respect to both the uncharged and charged conduct.

The defendant argues that L's allegations regarding the 2004 Mount Everest incident were far more serious than the charged conduct, therefore strengthening the likelihood that the uncharged misconduct evidence was harmful. The two acts of abuse, however, are fairly similar. With respect to both the uncharged and charged conduct, L alleged that the defendant hit her in the head. We cannot conclude that punching her in the side of the head is more or less severe than repeatedly slamming her head into a wooden table. Certainly, the defendant's alleged conduct in the 2004 incident was not so much more severe than the charged conduct such that there was a substantial risk that the passions of the jury would be unduly aroused or swayed by emotion in assessing the other evidence against the defendant.

The defendant also argues that the uncharged misconduct was harmful because the state mentioned it at the very end of its rebuttal closing argument, making it the last point the jury heard before beginning its deliberation. That instance, however, was the only mention by the state of the uncharged misconduct during the entirety of its closing and rebuttal arguments. In fact, rather than relying on the uncharged misconduct evidence, the state focused on the evidence relating to the charged offenses. Moreover, the one time the state did mention the uncharged misconduct evidence during its closing argument, it followed the reference with a reminder to the jury that "[t]he 2004 events are both in for a limited purpose. They're in for one purpose, and that is basically to show the defendant's malice, animus toward [L], and his intent to harm her; that's what they're in for." Thus, it is unlikely that the state's reference to the Mount Everest incident during closing argument improperly influenced the jury.

In light of the overwhelming evidence supporting the

defendant's conviction of breach of the peace in the second degree, the court's limiting instructions regarding the proper purpose for which the uncharged misconduct evidence could be considered, and the extent to which cross-examination of L was permitted, we are not persuaded that the defendant has met his burden to establish that the court's admission of the uncharged misconduct evidence substantially affected the verdict. We conclude, therefore, that the admission of such evidence was harmless and reject the defendant's claim.

### III

Finally, the defendant claims that the court's failure to canvass him regarding his decision to testify violated his right against self-incrimination, as guaranteed by the fifth and fourteenth amendments to the federal constitution. The defendant argues that, in the absence of a canvass, his waiver of that right was not intelligent and voluntary. We disagree.

To begin, we note that "[w]hether the defendant waived . . . fifth amendment privileges is a mixed question of law and fact over which our review is de novo." *State* v. *Ross*, 269 Conn. 213, 291, 849 A.2d 648 (2004). It is well established that there is no constitutional obligation on the court to canvass the defendant before he or she takes the witness stand and testifies. See *State* v. *Woods*, 297 Conn. 569, 573–77, 4 A.3d 236 (2010). Rather, because "a criminal defendant's decision to testify is often strategic or tactical, and is made only after serious consultation with counsel about the advantages and disadvantages thereof, it is one we are disinclined to second guess . . . . We can only assume, without more than a bare assertion to the contrary, that counsel provided the defendant with the information necessary to make an informed decision whether to testify." (Internal quotation marks omitted.) Id., 576, quoting *State* v. *Castonguay*, 218 Conn. 486, 492 n.2, 590 A.2d 901 (1991). Thus, because the defendant in the present case was represented by counsel throughout his trial, the court was under no obligation to inquire of the defendant whether his decision to testify was intelligent and voluntary.

The defendant argues that even if no such constitutional requirement exists, this court should exercise its supervisory authority over the administration of justice and impose one. Specifically, the defendant argues that requiring a court to canvass a defendant regarding his right against self-incrimination before he testifies would be more impactful than consultation with an attorney.

We decline the defendant's request to exercise our supervisory authority. "The exercise of our supervisory powers is an extraordinary remedy to be invoked only when circumstances are such that the issue at hand, while not rising to the level of a constitutional violation, is nonetheless of utmost seriousness, not only for the

integrity of a particular trial but also for the perceived fairness of the judicial system as a whole." (Internal quotation marks omitted.) *State* v. *Elson*, 311 Conn. 726, 765, 91 A.3d 862 (2014). We remain unpersuaded that the circumstances of the present case call for such an extraordinary remedy. See *In re Daniel N.*, 323 Conn. 640, 647–48, 150 A.3d 657 (2016) ("In almost all cases, [c]onstitutional, statutory and procedural limitations are generally adequate to protect the rights of the [appellant] and the integrity of the judicial system. . . . [O]nly in the rare circumstance [in which] these traditional protections are inadequate to ensure the fair and just administration of the courts will we exercise our supervisory authority . . . ." [Citation omitted; internal quotation marks omitted.]). Moreover, in light of *State* v. *Woods*, supra, 297 Conn. 569, and *State* v. *Castonguay*, supra, 218 Conn. 486, we conclude that any determination of whether a court should be required to canvass a defendant regarding his right against self-incrimination before he testifies is better left to our Supreme Court.

The judgment is affirmed.

In this opinion the other judges concurred.

[1] In accordance with our policy of protecting the privacy interests of the victims of family violence, we decline to identify the victim or others through whom the victim's identity may be ascertained. See General Statutes § 54-86e.

[2] L testified at trial that the defendant grabbed her by her hair and then twice slammed her head into the kitchen table. The jury ultimately found the defendant not guilty of assault in the third degree, which requires that the state prove physical injury. Although L suffered "several scratches to her left forearm," her medical records did not include any medical findings as to any visible injuries to her head, and only noted that she self-reported a headache and right ear pain. Thus, the jury may have declined to find the defendant guilty of the assault charge in the absence of evidence in L's medical records that she sustained physical injury to her head. Regardless, the jury must have found that the defendant struck L because it found him guilty of breach of the peace in the second degree in accordance with the state's allegation in count two of the information that the defendant struck L with the intent to cause alarm. The defendant has not raised a sufficiency of the evidence claim on appeal.

[3] The defendant testified that on July 1, 2012, he and L got into an argument because he asked her to make his father dinner and she became angry and attacked him. He further testified that he did not strike her at any point but had to put his hands up to defend himself.

[4] Hassett, who also represented the defendant in his dissolution of marriage case, did not seek to withdraw in that matter.

[5] Typically, a defendant's right to counsel of choice is implicated in circumstances in which both the defendant and the attorney want the representation to continue, but a third party moves to disqualify the attorney for one or more reasons. See, e.g., *State* v. *Peeler*, 265 Conn. 460, 465–68, 828 A.2d 1216 (2003), cert. denied, 541 U.S. 1029, 124 S. Ct. 2094, 158 L. Ed. 2d 710 (2004).

In circumstances in which a defendant's private attorney seeks to withdraw from representing the defendant, however, all the sixth amendment demands is "a reasonable opportunity to retain new counsel . . . ." *State* v. *Fernandez*, supra, 254 Conn. 650. Here, the defendant was permitted six weeks to obtain new private counsel, which was a sufficient period of time for sixth amendment purposes. See id. (two weeks was reasonable opportunity to seek new counsel).

[6] In a related context, our Supreme Court has been mindful of the dangers in forcing an attorney to represent a client in circumstances "devoid of the mutual trust and confidence that is critical to the attorney-client relationship. Such a strained and coerced relationship is inconsistent with the notion of the attorney-client relationship. The court should not perform such a shotgun

wedding." *Matza* v. *Matza*, 226 Conn. 166, 184, 627 A.2d 414 (1993).

[7] The defendant further argues that even if the court did comply with the provisions set forth in Practice Book § 3-10 (a) in granting Hassett's motion to withdraw as counsel, any such finding of good cause was improper because the sole reason why Hassett wanted to withdraw was that he disagreed with the defendant's decision to go to trial. Hassett, however, represented to the court several valid reasons why he believed that withdrawal was appropriate apart from the defendant's insistence on going to trial. We therefore reject the factual premise of the defendant's argument.

[8] The state also notified the defendant that it intended to introduce uncharged misconduct evidence through the testimony of one other individual, but no such evidence was presented at trial.

[9] The court instructed the jury that "[t]here has been some testimony of acts of prior misconduct on the part of the defendant. Now, this is not being offered to prove bad character, propensity or criminal tendencies. Such evidence is admitted solely to show [that] if it, in your mind, does show the defendant's intent, malice upon the part of the defendant against the complainant, and a motive for the commission of the crimes that are alleged in today's information. You're not to consider such evidence as establishing a predisposition on the part of [the] defendant to commit any of the crimes charged or to demonstrate a criminal propensity. You may only [consider] such evidence for the three objects I have stated. If it is further found by you that it logically, rationally, and conclusively supports the issues for which it's being offered. If you don't believe it or if you find it does not logically and rationally and conclusively support the issues for which it is offered, that is, intent, malice, and motive, you may not consider it for any other purpose. You may not consider evidence of other misconduct of the defendant for any purposes other than the ones I just told you because it may predispose your mind to believe the defendant may be guilty of the offense here charge[d] or offenses merely because of other misconduct."

[10] At oral argument, the court remarked to the assistant state's attorney that "you've essentially acknowledged that it was an abuse of discretion that [the uncharged misconduct evidence] was admitted and you're saying that, despite that, it's harmless," to which the state responded, "[t]hat's right." The court further inquired, "[i]s that correct?" to which the state again responded, "right."