******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

## STATE OF CONNECTICUT *v.* DAVID BRITTO
### (AC 47223)

Elgo, Wilson and Keller, Js.

*Syllabus*

Convicted of sexual assault in the first degree and other crimes, the defendant appealed to this court. He claimed, inter alia, that the trial court failed to adequately make him aware of the dangers and disadvantages of self-representation when canvassing him to determine if his waiver of his right to counsel was made knowingly, voluntarily and intelligently because the court did not explain to him the limited role of standby counsel as set forth in the rule of practice (§ 44-5). *Held*:

The trial court's canvass of the defendant did not establish that he made a knowing and intelligent waiver of his right to counsel, as the court provided him with no information from which he could differentiate between the limited role of standby counsel and that of full counsel, and, without such an explanation, this court could not conclude that the defendant was adequately aware of the dangers and disadvantages of self-representation; accordingly, the judgment was reversed and the case was remanded for a new trial.

This court, although it declined to address the defendant's claim that the trial court violated his due process rights, including his right to present a defense, when it improperly denied him a continuance to obtain authorization from the Office of the Chief Public Defender to obtain a DNA expert, noted its concern with the trial court's determination that the defendant himself was solely responsible for obtaining such authorization.

Argued June 16—officially released October 28, 2025

*Procedural History*

Substitute information charging the defendant with the crimes of sexual assault in the first degree, unlawful restraint in the first degree and assault in the third degree, brought to the Superior Court in the judicial district of New Haven and tried to the jury before *Alander, J.*; thereafter, the court denied the defendant's motion for a continuance; verdict of guilty; subsequently, the court, *Brown, J.*, rendered judgment in accordance with the verdict, from which the defendant appealed to this court. *Reversed*; *new trial*.

*John R. Weikart*, assigned counsel, with whom, on the brief, was *Emily Graner Sexton*, assigned counsel, for the appellant (defendant).

*Rebecca R. Zeuschner*, deputy assistant state's attorney, with whom, on the brief, were *John P. Doyle*, state's attorney, and *Stacey M. Miranda*, supervisory assistant state's attorney, for the appellee (state).

*Opinion*

KELLER, J. The defendant, David Britto, appeals from the judgment of conviction, rendered after a jury trial, of sexual assault in the first degree in violation of General Statutes § 53a-70 (a) (1), unlawful restraint in the first degree in violation of General Statutes § 53a-95 (a), and assault in the third degree in violation of General Statutes § 53a-61 (a) (1). On appeal, the defendant claims that the trial court (1) inadequately canvassed him to determine whether his waiver of his right to counsel was knowing, voluntary and intelligent, and (2) violated his due process rights, including his right to present a defense, when it denied his request for a continuance to obtain a DNA expert. We agree with the defendant's first claim and, accordingly, reverse the judgment of the trial court.

The jury reasonably could have found the following facts. During the early morning hours of July 19, 2018, the complainant, C,[1] was walking home from a party in New Haven. A man, whom the complainant did not know, offered her a ride. The complainant, who was

---

[1] In accordance with our policy of protecting the privacy interests of the victims of sexual assault, we decline to identify the complainant. See General Statutes § 54-86e.

Moreover, in accordance with federal law; see 18 U.S.C. § 2265 (d) (3) (2018), as amended by the Violence Against Women Act Reauthorization Act of 2022, Pub. L. No. 117-103, § 106, 136 Stat. 49, 851; we decline to identify any person protected or sought to be protected under a protection order, protective order, or a restraining order that was issued or applied for, or others through whom that person's identity may be ascertained.

"tipsy" at the time,[2] got in the car. She gave the man directions toward her house.

After approximately twenty to thirty minutes, the complainant realized that the drive was taking longer than it should have taken. While they were at a stop sign, the complainant tried to open the passenger door to get out, but the door was locked. The man continued driving, and the complainant asked him to let her out of the car. The man parked on a residential street and told the complainant: "[Y]ou're gonna give me that pussy." The complainant responded: "[N]o, please let me out of the car."

A physical altercation ensued between the man and the complainant. The man punched the complainant in the forehead. The complainant's arms were scratched and her shirt was ripped. The man started to pull the complainant's pants down, and the complainant, who believed the man was going to kill her, pulled her pants down the rest of the way. The complainant stated, " 'no,' over and over and over  . . . ." The man then penetrated her vaginally with his penis.

The man subsequently drove to a different location and let the complainant out of his car. A good Samaritan offered to help the complainant and drove her to Yale New Haven Hospital. At the hospital, the complainant reported that she had been sexually assaulted. A sexual assault kit was administered, and an officer from the New Haven Police Department met with the complainant.

The sexual assault kit was processed by DNA analysts at Bode Technology, a private laboratory located in Virginia that had a contract with the state forensic laboratory. Male DNA was discovered on the vaginal swabs

---

[2] At trial, the complainant explained that she "had a couple of drinks" and "smoked some weed" at the party.

in the complainant's sexual assault kit. In addition, male DNA was discovered on a dried secretion swab that had been taken from one of the complainant's arms and hands, and a DNA profile was generated from that evidence.

In April, 2019, the complainant identified the defendant as the perpetrator from a photographic array shown to her by the police. The police subsequently obtained a search warrant to collect DNA from the defendant via a buccal swab. A forensic science examiner from the state forensic laboratory compared the DNA profile generated from the defendant's buccal swab with DNA profiles from the complainant's sexual assault kit. The DNA profiles from the vaginal swabs and dried secretion swab matched the DNA profile of the defendant.[3] The defendant was arrested in October, 2021, and charged with sexual assault in the first degree, unlawful restraint in the first degree, and assault in the third degree.

At a pretrial proceeding on April 10, 2023, the defendant invoked his right to self-representation. After conducting a canvass, the court, *Harmon*, *J.*, found that the defendant knowingly, intelligently, and voluntarily waived his right to counsel. The court appointed Attorney Paul V. Carty to serve as the defendant's standby counsel, and the defendant proceeded to trial in a self-represented capacity.

---

[3] At trial, the forensic science examiner who compared the profiles testified that the expected frequency of individuals who could be contributors to the DNA profile from the dried secretion swab was less than one in seven billion in the general population. In addition, the expected frequency of individuals who could be the source of the DNA profile from the epithelial fraction of the vaginal swab was less than one in 2000 in the general male population, and the expected frequency of individuals who could be the source of the DNA profile from the sperm rich fraction of the vaginal swab was less than one in 820 in the general male population.

The trial began on June 20, 2023. The state presented the testimony of the complainant; the nurses who provided treatment to the complainant at the hospital and administered the sexual assault kit; the responding police officer who spoke to the complainant at the hospital on the date of the incident; and the police officer who conducted the photographic array procedure. The state also presented numerous witnesses regarding the DNA evidence, including several DNA analysts from Bode Technology who had processed the complainant's sexual assault kit; the detectives from the New Haven Police Department who were involved in obtaining the defendant's buccal swab and transporting it to the state forensic laboratory for DNA testing; and the forensic science examiners from the state forensic laboratory who generated the defendant's DNA profile from his buccal swab and compared that profile to the DNA profiles generated from the sexual assault kit.

The defendant did not present any witnesses. The defendant had requested a continuance during trial in order to present a DNA expert, but the court, *Alander, J.*, denied that request on the ground that the defendant had failed to file an authorization request with the Office of the Chief Public Defender (OCPD) to obtain funding for an expert, and it was too late for the defendant to make that request given that the jury already had heard two days of evidence.

The trial court held a hearing outside the presence of the jury on June 22, 2023, the third day of trial, prior to denying the defendant's request for a continuance. The court heard about the defendant's efforts to obtain funding for a DNA expert from the defendant himself; Carty, the defendant's standby counsel; Attorney John R. Day, the Deputy Chief Public Defender for the OCPD who was involved in the process of providing funds for expert services; and Joyce Bellamy, the director of DNA

Genetics Lab in Woodbridge, with whom the defendant had been in contact about providing expert services.[4] Day explained that, in March, 2023, the OCPD had determined that a DNA expert was reasonably necessary to the defendant's defense and approved funding pursuant to a request submitted by Attorney Jamie E. Alosi, who represented the defendant before he invoked his right to self-representation. Pursuant to that approval, the defendant was authorized to retain a certain DNA expert, who was not affiliated with DNA Genetics Lab, for a total of $4000, at a rate of $250 per hour for sixteen hours. In May, 2023, after the defendant became self-represented, Carty obtained an authorization for DNA Genetics Lab to perform certain services on the defendant's behalf at a flat rate of $450.

Day received an invoice directly from DNA Genetics Lab for services totaling $4150, which included work performed at a rate of $350 per hour.[5] The defendant had not received an authorization to incur the expenses reflected on that invoice, and Day explained that any expenses billed at a rate higher than $300 per hour had to be approved by the Public Defender Services Commission (commission), which would not meet until June 27, 2023.[6] Day emailed Carty about the invoice on June 6, 2023, and arranged a phone call with the defendant and Carty on June 7, 2023. During the phone call, Day outlined the procedure for hiring an expert

---

[4] The trial court began to address the defendant's request for a continuance on June 21, 2023, the second day of trial but continued the matter in order for Day and Bellamy to appear in court.

[5] Bellamy testified that DNA Genetics Lab initially generated a DNA profile from the defendant's buccal swab for the flat rate fee of $450. After that, however, the defendant sought additional services, including DNA profile comparison, case review and consultation, and expert testimony.

[6] By the time of trial, DNA Genetics Lab had submitted a new invoice to Day that reflected services performed at a rate of $300 per hour but which totaled $8614.25. Day explained that services exceeding $6500 from a single vendor in a sex assault case also required approval from the commission.

through the OCPD and told the defendant and Carty that they needed to submit a new authorization request for the increased fees. Day explained to the court that he typically asks standby counsel to submit requests on behalf of self-represented defendants, as assigned counsel has the ability to submit requests that are processed through the electronic database that manages expense requests.

Bellamy, from DNA Genetics Lab, explained that she had been in contact with the defendant since April, 2023. She spoke to both the defendant and Day about the issues regarding the invoice. After speaking with Day, Bellamy was under the impression that the defendant did not understand that there was an additional process, apart from obtaining the invoice, that had to be completed for authorization. In addition, she explained that, even if the laboratory was authorized to provide the services requested by the defendant, it would take approximately two more weeks to complete.

Carty acknowledged that he was aware that the defendant was required to submit an authorization request and that they "were kind of in a bind" because they were "running out of time to get it done . . . ." Nevertheless, Carty viewed his role as "only tangential, sort of like a pass-through . . . to the [OCPD]. Whatever was submitted to me I would pass through them. . . . But in terms of making arrangements . . . I felt as standby counsel that that's kind of beyond what my role was."

The defendant, however, believed that Carty, as his standby counsel, would keep him informed of what was going on. In addition, the defendant believed that he was "out of it" at that time, as Day and Bellamy were "in the process of trying to iron out" the issues related to the invoice. Ultimately, although Carty and Day were aware of the defendant's attempts to obtain funding for

a DNA expert, the trial court faulted the defendant for failing to file an authorization request[7] and for failing to request a continuance prior to June 20, 2023, the first day of trial.[8]

The jury subsequently found the defendant guilty of all charges. Thereafter, the trial court imposed a total effective sentence of twenty years of incarceration, execution suspended after sixteen years, followed by twenty-five years of probation. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the trial court inadequately canvassed him to determine whether his waiver of his right to counsel was knowing, voluntary, and intelligent. Specifically, the defendant contends that the court, inter alia, failed to adequately make him aware of the dangers and disadvantages of self-representation

---

[7] Specifically, the trial court told the defendant: "[Y]ou were in control of getting [a] DNA expert" and "you were specifically told by [Day] in a phone conversation that you needed to file that authorization. You could have done it, you could have asked [Carty] to do it, you didn't." In addition, after the court ruled and the defendant asked whether trial was going to continue without his DNA expert, the court told the defendant: "Correct. . . . And . . . that's on you."

[8] Our review of the record reflects that the defendant raised the issue of funding for his DNA expert before trial started, on June 12, 2023, the first day of jury selection. Specifically, the defendant stated: "[T]here's another expert witness that I'm waiting for now because it has something to do with a DNA expert. Now, as we speak, [Day] . . . he's working with Genetics Lab out of Woodbridge, Connecticut, and they supposed to have some type of payment being made so that expert witness can be acknowledged. So, what I'm saying is . . . I might have to file a motion for extended time because I got one more name, and he's the most important one."

Although the trial court recognized that the defendant had raised this issue during jury selection, it emphasized that the defendant did not request a continuance prior to June 20, 2023. On June 20, immediately before trial commenced, the defendant told the court that the funding for his DNA expert still had not been approved and that Day was in the process of getting information from DNA Genetics Lab for the approval.

because it did not explain the limited role of standby counsel.[9] We agree.

The following additional facts and procedural history are relevant to the defendant's claim. Throughout the course of the pretrial proceedings, the defendant had been represented by several different attorneys. On April 4, 2023, Alosi, who represented the defendant at that time, filed a motion to withdraw her appearance. The court, *Harmon, J.*, addressed Alosi's motion at a hearing on April 10, 2023. The court told the defendant: "[I]f we release . . . [Alosi] from your case. you're gonna need another attorney." The defendant responded: "I'd like to represent myself, Your Honor." The court told the defendant that it would need to canvass him to determine whether he could represent himself. Before the court conducted its formal canvass, the following colloquy took place:

"The Court: You have to understand . . . [i]f the court were to grant a motion for you to represent yourself, some of those things you're talking about suddenly become your responsibility; a DNA expert becomes your responsibility to get in this case, the investigation on it all becomes your responsibility in terms of that, and you're the one [who] would have to facilitate and

---

[9] The defendant also contends that the trial court (1) made certain statements indicating that it "presume[d] self-representation" rather than adhering to the presumption against the waiver of the right to counsel, (2) failed to adequately investigate whether the defendant wanted to represent himself given the discrepancies in the defendant's answers about whether he wanted to waive the right to counsel, (3) failed to determine whether the defendant truly wanted to represent himself or whether he instead sought self-representation out of frustration from the withdrawal of several attorneys who had been appointed to represent him, and (4) made statements that "tended to pressure the defendant toward self-representation." In light of our conclusion that the canvass was constitutionally infirm insofar as the court inadequately apprised the defendant of the dangers and disadvantages of self-representation by failing to explain the limited role of standby counsel, we need not address these additional claims. See *State* v. *Diaz*, 274 Conn. 818, 828 n.11, 878 A.2d 1078 (2005).

make those things happen. . . . If you represent your-self, you basically are the attorney. You know, you're your own attorney and . . . you're gonna be treated just like any other attorney by the court, not by me, but by your trial judge, who's going to say, hey, as far as I'm concerned, you're an attorney, you decide to represent yourself, you're not gonna get any special favors . . . they can't help you throughout the trial, they can't try and push things your way, or, if you miss something, they can't tell you, hey, you missed something; they're not able to do that. So, a lot of times, that's why, when people say they're going to represent themselves, we end up having what's called some type of standby counsel, or somebody there with them to assist them in some manner. Even though they may be doing the case themselves, they still have someone assisting them there who has a more in-depth knowl-edge of the law itself, okay.

"The Defendant: Um-hm. I understand.

"The Court: Okay. So, that's where [we] are with that. So, I know that . . . you've had a number of attorneys, okay, and none of them have worked out. . . . My question is, when you're asking to represent yourself, is that because none of these attorneys have worked out, or is it because you actually want to represent yourself and you feel that you are the best person to represent yourself?

"The Defendant: Is that a question?

"The Court: That's a question. Yes.

"The Defendant: Okay. I know my case. I know what's wrong. I know what's right. I know what didn't happen. I know what did happen. . . .

"The Court: Do you feel that you know the law?

"The Defendant: I can get help. There's a law library upstairs, and there's also people . . . in the community that I know that [have been] pulling my coat on certain things, such as this DNA issue and likewise and so forth and so on. So, I believe in myself, and I know that if I'm gonna be put away, okay, I'm gonna put myself away. I don't need nobody help putting me away, okay. And, as far as me finding out about things, about my case and everything, I know everything, okay, because, like I said, I know my case better than anybody, okay."

During its formal canvass, the trial court advised the defendant regarding the nature of the charges against him, the maximum penalties associated with those charges, and his right to the assistance of counsel, including the appointment of counsel. With respect to the dangers and disadvantages of self-representation, the following colloquy took place:

"The Court: You understand if you had an attorney representing you, the attorney would be obligated to investigate the charges against you, advise you of the strengths and weaknesses of the state's case against you, and help you decide whether to accept a plea agreement with the state or plead not guilty and go to trial. You understand that?

"The Defendant: Yes.

"The Court: Okay. Do you feel that those are things that you can do yourself without the assistance of an attorney?

"The Defendant: Yes.

＊ ＊ ＊

"The Court: . . . [Y]ou know that, at the trial, the judge is not going to be able to give you any legal advice. You understand that?

"The Defendant: Yes.

"The Court: You understand that the judge must remain impartial and cannot give you procedural or substantive advice. You understand that?

"The Defendant: Yes.

"The Court: So, you'll have to educate yourself on the procedures on what's going to happen during the courtroom, what happens during jury selection; anything of that nature, that's going to become your responsib[ility]. You understand that?

"The Defendant: Say that one more time.

"The Court: Anything that happens during jury selection or with any type of pretrial motions, that becomes your responsibility, you understand that? When you're representing yourself, you're the attorney.

"The Defendant: So, anything in regard to the trial itself?

"The Court: That's correct.

"The Defendant: Okay. Yep.

\* \* \*

"The Court: As far as any experience with court proceedings, have you seen court proceedings before?

"The Defendant: Yes.

"The Court: And you've come here and participated in your court proceedings; is that correct?

"The Defendant: Yes.

"The Court: Knowing all that I have explained to you, including the charges against you, the possible punishment for those charges, the dangers and disadvantages of representing yourself, do you wish to represent yourself and waive your right to counsel at this time?

"The Defendant: No.

"The Court: Okay. Then you don't want to represent yourself?

"The Defendant: No . . . I don't want to waive the right to counsel. . . . I mean, it's obvious that I don't know the law, I'm not a lawyer, but I do know enough facts about my case where I believe that I could explain it to the fullest where I can, you know . . . get a not guilty plea.

"The Court: . . . I guess my question is, though, but when you're saying that, Mr. Britto . . . when you're giving up your right to have an attorney represent you . . . that's where you're saying you wish to represent yourself . . . .

"The Defendant: Right.

"The Court: And you're waiving your right to have an attorney represent you.

"The Defendant: Right.

"The Court: So, that's what I'm asking you. Are you waiving your right, giving up the right to have an attorney represent you and representing yourself?

"The Defendant: . . . As I just answered you, I'm going to need some help, okay, along the way with things that I may not be familiar with because I'm not a lawyer.

"The Court: I can appoint . . . . So, it sound[s] like you're gonna need standby counsel . . . .

"The Defendant: Yeah. Yes.

"The Court: Okay. . . . So, what we're gonna do is, the court, at this time, we're gonna . . . [y]ou're waiving your right to have counsel represent you; is that correct?

"The Defendant: Yes.

"The Court: Okay. Has anyone threatened you or forced you to do this?

"The Defendant: Now, wait a minute. Wait a minute. You just said something about I'm going to need standby counsel, then you just asked me . . . .

"The Court: I'm getting to that part.

"The Defendant: . . . then you just asked me . . .

"The Court: I'm gonna get to that . . . I'm going to get to that part.

"The Defendant: Okay. Okay. Yep.

"The Court: Okay. So, has anyone threatened you or forced you to make this decision to represent yourself today with standby counsel?

"The Defendant: No.

"The Court: Okay. So, what I'm going to do today is, I'm going to . . . based on your appearance in court today, your responses to my questions, I'm going to find that you're competent to proceed with standby counsel on your own at this time, and that you knowingly, intelligently, and voluntarily . . . have waived your right to counsel, but I am appointing standby counsel, okay." The court subsequently appointed Carty to serve as the defendant's standby counsel.

The following legal principles guide our analysis of the defendant's claim. "It is well established that [w]e review the trial court's determination with respect to whether the defendant knowingly and voluntarily elected to proceed pro se for abuse of discretion. . . .

"The right to counsel and the right to self-representation present mutually exclusive alternatives. A criminal defendant has a constitutionally protected interest in

each, but [because] the two rights cannot be exercised simultaneously, a defendant must choose between them. When the right to have competent counsel ceases as the result of a sufficient waiver, the right of self-representation begins. . . . Put another way, a defendant properly exercises his right to self-representation by knowingly and intelligently waiving his right to representation by counsel. . . .

"[A] defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation . . . . Rather, a record that affirmatively shows that [he] was literate, competent, and understanding, and that he was voluntarily exercising his informed free will sufficiently supports a waiver. . . . The nature of the inquiry that must be conducted to substantiate an effective waiver has been explicitly articulated in decisions by various federal courts of appeals. . . .

"Practice Book § [44-3][10] was adopted in order to implement the right of a defendant in a criminal case to act as his own attorney . . . . Before a trial court may accept a defendant's waiver of counsel, it must conduct an inquiry in accordance with § [44-3], in order to satisfy itself that the defendant's decision to waive counsel is knowingly and intelligently made. . . .

---

[10] Practice Book § 44-3 provides: "A defendant shall be permitted to waive the right to counsel and shall be permitted to represent himself or herself at any stage of the proceedings, either prior to or following the appointment of counsel. A waiver will be accepted only after the judicial authority makes a thorough inquiry and is satisfied that the defendant:

"(1) Has been clearly advised of the right to the assistance of counsel, including the right to the assignment of counsel when so entitled;

"(2) Possesses the intelligence and capacity to appreciate the consequences of the decision to represent oneself;

"(3) Comprehends the nature of the charges and proceedings, the range of permissible punishments, and any additional facts essential to a broad understanding of the case; and

"(4) Has been made aware of the dangers and disadvantages of self-representation."

Because the § [44-3] inquiry simultaneously triggers the constitutional right of a defendant to represent himself and enables the waiver of the constitutional right of a defendant to counsel, the provisions of § [44-3] cannot be construed to require anything more than is constitutionally mandated. . . .

"The multifactor analysis of [Practice Book § 44-3], therefore, is designed to assist the court in answering two fundamental questions: first, whether a criminal defendant is minimally competent to make the decision to waive counsel, and second, whether the defendant actually made that decision in a knowing, voluntary and intelligent fashion. . . . As the United States Supreme Court [has] recognized, these two questions are separate, with the former logically antecedent to the latter. . . . Inasmuch as the defendant's competence is uncontested, we proceed to whether the trial court abused its discretion in concluding that the defendant made the waiver decision in a knowing, voluntary, and intelligent fashion." (Citations omitted; footnote added; internal quotation marks omitted.) *State* v. *Joseph A.*, 336 Conn. 247, 254–56, 245 A.3d 785 (2020).

"[I]n order [to] competently and intelligently . . . choose self-representation, [a defendant] should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that he knows what he is doing and his choice is made with eyes open." (Internal quotation marks omitted.) *State* v. *Williams*, 206 Conn. App. 539, 552, 260 A.3d 485, cert. denied, 339 Conn. 910, 261 A.3d 744 (2021). In *State* v. *Collins*, 299 Conn. 567, 10 A.3d 1005, cert. denied, 565 U.S. 908, 132 S. Ct. 314, 181 L. Ed. 2d 193 (2011), which involved a "model canvass," the trial court "satisfied its critical responsibility of cautioning the defendant about the potentially disastrous consequences of electing to proceed pro se" by urging him to exercise his right to assigned counsel in light of the dangers of

self-representation, including cautions that he would be held responsible for complying with all applicable procedural and evidentiary rules, that his actions during the trial could adversely affect subsequent appellate or postconviction remedies, and that a trained attorney would have the requisite skill and training to better protect his rights while trying his case. Id., 612–13.

In the present case, the defendant contends that the trial court failed to adequately make him aware of the dangers and disadvantages of self-representation because it did not explain the limited role of standby counsel. The limited role of standby counsel is set out in Practice Book § 44-5, which provides: "If requested to do so by the defendant, the standby counsel shall advise the defendant as to legal and procedural matters. If there is no objection by the defendant, such counsel may also call the judicial authority's attention to matters favorable to the defendant. Such counsel shall not interfere with the defendant's presentation of the case and may give advice only upon request."

"[T]he role of standby counsel is essentially to be present with the defendant in court and to supply the limited assistance provided for in Practice Book § 44-5 . . . . [S]tandby counsel does not, however, have any obligation to perform legal research for the defendant." (Footnote omitted.) *State* v. *Fernandez*, 254 Conn. 637, 658, 758 A.2d 842 (2000), cert. denied, 532 U.S. 913, 121 S. Ct. 1247, 149 L. Ed. 2d 153 (2001); see also *State* v. *Miller*, 186 Conn. App. 654, 664 n.9, 200 A.3d 735 (2018) ("legal research is beyond the scope of the responsibilities of standby counsel"). In discussing the role of standby counsel, our Supreme Court has stated that such counsel "serves as a legal resource to pro se defendants, thereby enabling them to have meaningful access to the courts while still exercising their right to represent themselves." (Internal quotation marks omitted.) *State* v. *Beaulieu*, 274 Conn. 471, 479 n.3, 876 A.2d 1155

(2005); see also *State* v. *Wang*, 312 Conn. 222, 255 n.32, 92 A.3d 220 (2014) ("standby counsel is an appropriate channel through which a self-represented defendant may access legal information"); *State* v. *Fernandez*, supra, 655 ("[S]tandby counsel afforded the defendant an adequate link to legal information. . . . [H]e could answer the defendant's questions about the law and offer the defendant advice if he so requested.").

The limited role of standby counsel has been discussed in some cases as part of the risks associated with self-representation. See *State* v. *Diaz*, 274 Conn. 818, 827, 878 A.2d 1078 (2005) (court informed defendant "of the limited role of standby counsel" during canvass); *State* v. *Davalloo*, 153 Conn. App. 419, 445, 101 A.3d 355 (2014) (during canvass, "defendant said that she understood that the role of a standby counsel was to'sit there mute' unless she asked questions and sought help from him"), aff'd, 320 Conn. 123, 128 A.3d 492 (2016); see also *State* v. *D'Antonio*, 274 Conn. 658, 699, 877 A.2d 696 (2005) (court recanvassed defendant to ensure that he understood, inter alia, role of standby counsel); *Ross* v. *Commissioner of Correction*, 217 Conn. App. 286, 310, 288 A.3d 1055 (court explained "standby counsel's limited role" to petitioner), cert. denied, 346 Conn. 915, 290 A.3d 374 (2023).

From our review of the canvass in the present case, it is clear that the defendant was apprehensive about proceeding in a self-represented capacity based on his lack of legal knowledge. At the conclusion of the trial court's canvass, when the court asked the defendant whether he wanted to waive his right to counsel, the defendant responded: "No." The defendant explained: "[I]t's obvious that I don't know the law, I'm not a lawyer," and, "I'm going to need some help . . . along the way with things that I may not be familiar with because I'm not a lawyer."

In addition, it is apparent that the trial court's appointment of standby counsel was integral to the defendant's decision to waive his right to counsel. Once the court told the defendant, "it sound[s] like you're gonna need standby counsel," the defendant responded: "Yeah. Yes," and stated that he did want to waive his right to counsel. Even as the court continued with its canvass, the defendant sought to ensure that he was proceeding with the assistance of standby counsel.[11]

The trial court, however, did not explain the limited role of standby counsel. Prior to its formal canvass, the court had described standby counsel as "somebody there with [self-represented defendants] to assist them *in some manner*. Even though they may be doing the case themselves, they still have *someone assisting them there who has a more in-depth knowledge of the law itself* . . . ." (Emphasis added.) When the court subsequently told the defendant that "it sound[s] like you're gonna need standby counsel," it did not provide any further explanation as to what kind of assistance standby counsel would provide. Indeed, the court provided the defendant with no information from which he could differentiate between the role of standby counsel and that of full counsel.

Accordingly, we conclude that, under the particular circumstances of the present case, where the trial court's appointment of standby counsel played a pivotal role in the defendant's decision to waive the right to counsel, the court should have explained the limited

---

[11] As set forth previously in this opinion, when the trial court asked the defendant whether anyone had threatened him or forced him to waive his right to counsel, the defendant responded: "Now, wait a minute. Wait a minute. You just said something about I'm going to need standby counsel, then you just asked me . . . ." The court reassured the defendant that it would appoint standby counsel, stating, "I'm going to get to that part," and asking: "[H]as anyone threatened you or forced you to make this decision to represent yourself today *with standby counsel*?" (Emphasis added.)

role of standby counsel. Without such an explanation, we cannot conclude that the defendant was adequately aware of the dangers and disadvantages of self-representation.

In reaching this conclusion, we recognize that a defendant "does not possess a constitutional right to a specifically formulated canvass . . . ." (Internal quotation marks omitted.) *State* v. *Williams*, supra, 206 Conn. App. 559; see also *State* v. *Joseph A.*, supra, 336 Conn. 259 (although canvasses in certain other cases "included specific warnings of the dangers of self-representation . . . the fact that the canvass the defendant received in the present case was different from the canvasses in those cases is not dispositive" (citations omitted)). In the present case, however, the canvass provided the defendant with *no* indication of the limited role of standby counsel as set forth in Practice Book § 44-5.[12] Accordingly, it is unclear whether the defendant was aware that he would receive advice from standby counsel "only upon request"; Practice Book § 44-5; or that standby counsel would not conduct legal research on his behalf.[13] See *State* v. *Fernandez*, supra, 254 Conn. 658; *State* v. *Miller*, supra, 186 Conn. App. 664 n.9.

In sum, because the trial court failed to explain the limited role of standby counsel, we cannot conclude

---

[12] As set forth previously in this opinion, Practice Book § 44-5 provides: "*If requested to do so by the defendant*, the standby counsel shall advise the defendant as to legal and procedural matters. If there is no objection by the defendant, such counsel may also call the judicial authority's attention to matters favorable to the defendant. *Such counsel shall not interfere with the defendant's presentation of the case and may give advice only upon request.*" (Emphasis added.)

[13] Notably, the record also reflects that the court, *Harmon, J.*, was aware that the defendant was trying to obtain a DNA expert. The court, therefore, should have provided a full explanation of standby counsel's role, including when a defendant seeks to obtain funding for an expert witness, as set forth in *State* v. *Wang*, supra, 312 Conn. 222. See part II of this opinion.

that the record affirmatively demonstrates that the defendant, in choosing to represent himself, "[knew] what he [was] doing and his choice [was] made with eyes open." (Internal quotation marks omitted.) *State* v. *Williams*, supra, 206 Conn. App. 552. Accordingly, the canvass conducted by the court does not establish that the defendant made a knowing and intelligent waiver of his right to counsel.

## II

The defendant also claims that the trial court violated his due process rights, including his right to present a defense, when it denied his request for a continuance to obtain a DNA expert. Specifically, the defendant contends that the court improperly concluded that he, rather than standby counsel, was responsible for obtaining authorization for funding from the OCPD for the expert.

"As a general matter, when our appellate courts reverse a judgment and remand the case for a new trial, only claims likely to arise on retrial are addressed by the reviewing court." *State* v. *Robert R.*, 340 Conn. 69, 92, 262 A.3d 810 (2021). Although we cannot say that the defendant is unlikely to seek the assistance of a DNA expert on remand, if he chooses to do so, that process may result in a record different from the one presently before us, and, accordingly, we decline to address this claim at this time. See id.

Nevertheless, we briefly note that our Supreme Court's decision in *State* v. *Wang*, supra, 312 Conn. 222, emphasized a more proactive role for standby counsel in assisting an indigent self-represented party to obtain funding for an expert witness. In that case, our Supreme Court concluded that "an indigent self-represented criminal defendant has a fourteenth amendment due process right to [publicly] funded expert or investigative services, to the extent that such services are reasonably

necessary to formulate and to present an adequate defense to pending criminal charges." Id., 231. In reaching that conclusion, the court stated that "an indigent self-represented defendant may access funding for reasonably necessary defense costs *through standby counsel*"; (emphasis added) id., 254–55; explaining that "the trial court is authorized to appoint standby counsel, and the commission is authorized to fund reasonably necessary ancillary defense costs incurred by standby counsel who, thusly appointed, is serving pursuant to the provisions of the chapter of the General Statutes governing public defender services. *Standby counsel, upon request by the indigent self-represented defendant, may seek approval from the commission* to incur [r]easonable expenses for necessary . . . costs of defense that shall be paid from the budget of the commission upon approval of the commission." (Emphasis added; internal quotation marks omitted.) Id., 254; see also id., 262 ("[a]n indigent self-represented defendant may navigate the commission's existing administrative procedures *through standby counsel*" (emphasis added)).[14]

Although our Supreme Court noted that standby counsel would continue to maintain a more limited role than full counsel, it explained that the role of standby counsel was "to facilitate the self-represented defendant's compliance with the commission's existing administrative mechanisms for obtaining funding for ancillary defense costs . . . ." Id., 263 n.37. Accordingly, even though we need not address whether the

[14] Our Supreme Court's summary of the commission's internal procedures for the approval of defense expenses is consistent with Day's explanation in the present case: "[A]ttorneys representing public defender clients must obtain prior approval to hire experts and incur case related expenses by submitting, in writing, a form providing a detailed explanation of the nature of the case and the reasons why the expert or other service is necessary for the defense. . . . The level of approval required depends on the estimated cost and type of service requested." (Citation omitted; internal quotation marks omitted.) *State* v. *Wang*, supra, 312 Conn. 261–62.

court improperly denied the defendant's request for a continuance, we note our concern with the court's determination that the defendant himself was solely responsible for obtaining authorization for funding from the OCPD for a DNA expert.

The judgment is reversed and the case is remanded for a new trial.

In this opinion the other judges concurred.